(No. 33345.—

THE PEOPLE OF THE STATE OF ILLINOIS, Defendant in Error, *vs.* JOSEPH ORTEGA, Plaintiff in Error.

*Opinion filed February 16, 1955.*

Joseph Ortega, *pro se.*

Latham Castle, Attorney General, of Springfield, and John Gutknecht, State's Attorney, of Chicago, (John T. Gallagher, and Rudolph L. Janega, of counsel,) for the People.

Mr. Chief Justice Bristow delivered the opinion of the court:

Plaintiff in error, Joseph Ortega, appears here *pro se* claiming reversible error in a proceeding in the criminal court of Cook County, wherein he was found guilty by a jury of armed robbery, resulting in his sentence to the Illinois State Penitentiary on July 24, 1950, for a term of not less than five nor more than fifteen years.

This judgment eventuated from the following: On December 20, 1949, the defendant, Joseph Ortega, a young man 33 years of age, of Mexican extraction, operating with many aliases, visited the tavern of Mr. and Mrs. Sanchez, also Mexican, located at 3262 East Ninety-second Street in the city of Chicago. The defendant came to the tavern again on the following day. While in the tavern on December 21, Joseph requested change for a fifty-dollar bill. In Spanish Mrs. Sanchez told her husband, Louis, that there was not sufficient money in the cash register and for him to go upstairs to the clothes closet and get the change from their lockbox. Ortega drank freely, visited with Anita and Louis Sanchez, and was exceedingly friendly and ingratiatory. On that occasion he indicated

an interest in Mexican food and Mr. and Mrs. Sanchez volunteered to take him the next evening to a restaurant in East Chicago, Indiana, where the best could be obtained. After the arrival of the Sanchezes at the restaurant, the defendant called them there and stated that unforeseen events prevented his reaching the restaurant in time to eat with them but requested them to bring home an order of enchilada for him. When they returned home about 11:00 P.M., they had food not only for the defendant but for four members of their own family. After a pleasant hour of eating and conversation in both Spanish and English, upon his request Anita called a taxicab for the purpose of taking Ortega to a loop hotel. During his visit at the tavern on the 22d the defendant told Sanchez that he knew a friend who was coming off the high seas with some fine diamonds, and, if interested, he could obtain a stone for him at a bargain. After closing time that night Sanchez revealed to Anita the story about the diamonds.

On December 23, at 11:00 A.M., Joseph Ortega, then Rudy Marzo, and then Antonio Vercelles came to the tavern. Vercelles, who was supposed to be the diamond merchant, instead of displaying his stones, drew a revolver and ordered Mrs. Sanchez to go upstairs and surrender the contents of their safety box. It contained $7800 in currency, obtained by Mr. and Mrs. Sanchez from a sale of some real estate which was being paid for in installments. The three men with the money immediately fled, the police were alerted, and it took almost 30 days of notable work on the part of the detectives before the first one, Marzo, was arrested on January 20.

Mr. and Mrs. Sanchez identified Marzo instantly at a showup with others at the detective bureau. Marzo said that the amount taken was $3200 instead of $7800 and at the same time revealed the identity of his two accomplices. He stated that he just left them at the Allerton Hotel in Cleveland, Ohio; that defendant Ortega was using the

name of Joseph Avella and Vercelles was using the name of Antonio Franco; that it was their plan to return to Chicago immediately; and that the three were to meet him ·at the Chelsea Hotel in Chicago. On January 22, 1950, the Chicago officers received a telephone call from the Cleveland police reporting that they had arrested Avella and Franco, and that they would return without formal extradition process. On February 10, 1950, at 3:00 P.M., another showup was arranged, including seven men, among whom was Joseph Ortega alias Avella and Vercelles alias Antonio Franco, at which they were identified immediately by Mrs. Sanchez. Mrs. Sanchez stepped up to Vercelles and said, "This is the fellow who held me· up and made me go upstairs and give him the money." Vercelles said, "I never saw you before." She then pointed to Ortega: "This is the man who had been coming into our tavern for three or four days prior to the day of the robbery," and Ortega replied, "I was never in Chicago on that day. I have not been in Chicago for over a year."

On January 26, 1950, the Cook County grand jury returned an indictment against Joseph Ortega, Antonio Vercelles, and Rudy Marzo charging the three jointly with robbery while armed. Defendant's motion for a separate trial was denied, and on June 9, 1950, a jury trial was commenced, weighing the guilt or innocence of all three defendants. A guilty verdict caused the entry of the judgment heretofore mentioned, the propriety of which we have for review.

Seeking a reversal, the defendant Ortega asserts almost every error that is known to criminal jurisprudence. He claims the appointment of incompetent counsel. The record shows that defendant appeared in open court with Frank S. Loverde on February 23, 1950, counsel of his own choice, and entered a plea of not guilty. On March 22, 1950, Loverde was permitted to withdraw his appearance and Attorney Samuel J. Andalman filed his appearance as coun-

sel for defendant. Thereafter, on May 8, 1950, Andalman was permitted to withdraw his appearance, and the court on its own motion appointed new counsel for defendant. Between May 8 and June 8, when the trial commenced, defendant made no objection concerning his third counsel nor requested the privilege of employing one of his own choice.

At this juncture it might be appropriate to observe that along with defendant's change of counsel appeared defendant's change of defense. At the showup and when Ortega was returning to Chicago, he told the officer in charge that he was not in Chicago on December 23, 1949, "I was on a plane in China when the thing happened." And then on the trial the situation changed. The defendant testified that he was present with his two codefendants at the Sanchez tavern on Ninety-second Street but under altogether different circumstances than those related by the prosecuting witnesses; that they received not $7800 but $3200; that the money was not extracted at the point of a revolver but as the product of a confidence game; that they were dealing in opium, not diamonds, for Vercelles had just obtained in China a large quantity of opium, and Anita and Louis Sanchez were to become confederates in the narcotic business; and that they surrendered the $3200 to the three defendants so that they might enjoy full participation in the new adventure. This sudden switch, however, did not impress the jury. A careful reading of the record convinces us that defendant's counsel should not share the blame for the result.

When it became evident that the defendant was going to testify in his own behalf, the State's Attorney advised Ortega's counsel that he had sent for the authenticated copies of the records indicating felony convictions of plaintiff in error in various jurisdictions. Ortega admitted such involvements, thus his attorney did not exhibit inexperience when he sought to obviate the impact of the formal proof.

Frequently it is found to be good trial technique and advantageous to admit damaging evidence when you are sure that formal proof of it is inevitable.

On cross-examination the defendant was asked about his occupation, how long it had been since he had been gainfully employed. "It was two years ago that I held a position as black jack dealer in a place at Lake Tahoe, California." The State's Attorney is criticized by plaintiff in error for his vicious characterization of him before the jury. He referred to the defendant as a confidence man preying upon his fellow countryman, never usefully employed, glib, smooth and untrustworthy. The record supplies adequate support for everything the prosecuting official said about him.

The defendant in his testimony was most effusive. He talked interminably and wandered aimlessly. His lawyer and the court had great difficulty restraining him, seeking to keep his testimony within the realm of pertinency and responsiveness. Defendant criticizes the court for his effort to curb him. An interpreter was used extensively translating answers in Spanish to English. Much confusion was engendered by charges that the translations were inaccurate. Defendant complains that the court's rulings upon those matters were made in an arbitrary and prejudicial manner. On the contrary, the record evidences remarkable patience and fairness on the part of the trial court.

Defendant claims that instruction No. 10, which deals with flight, should not have been given as requested by the State. There can be no question that the defendants fled not only from the scene of the alleged crime but from the city, and when discovered in Cleveland, Ohio, the defendant was living under an assumed name. Under such circumstances the instruction was not vulnerable to the criticism leveled at it. Defendant claims also that instruction No. 6 singled him out unduly. The instruction advised the jury that the former conviction of a defendant may

be considered in testing the credibility of such defendant, but that the jury has no right to disregard his testimony, and if they have a reasonable doubt of defendant's guilt they should find him not guilty. Inasmuch as Vercelles also had a criminal record and on the trial there was evidentiary proof of it, the defendant was not alone in the application of the instruction.

We will not burden this opinion with the consideration of the many other groundless errors claimed by the defendant. The result obtained in the lower court is in accord with the evidence and the law and represents substantial justice and should not be disturbed.

*Judgment affirmed.*