(No. 40631.—

THE PEOPLE OF THE STATE OF ILLINOIS, Appellee, *vs.* GILBERT GALVIN, Appellant.

*Opinion filed Nov. 17, 1970.—Rehearing denied Oct. 4, 1971.*

PAUL W. KAISER, JR., of Waukegan, appointed by the court, for appellant.

WILLIAM J. SCOTT, Attorney General, of Springfield, and JACK HOOGASIAN, State's Attorney, of Waukegan, (JAMES B. ZAGEL, Assistant Attorney General, and JOHN V. VIRGILIO, Assistant State's Attorney, of counsel,) for appellee.

Mr. JUSTICE KLUCZYNSKI delivered the opinion of the court:

In a bench trial in the circuit court of Lake County, defendant, Gilbert Galvin, was found guilty of the crime of indecent liberties (Ill. Rev. Stat. 1965, ch. 38, par. 11—4), and sentenced to the penitentiary for a term of not less than 10 nor more than 15 years. His direct appeal to this court presents three issues: (1) whether the constitutional concept of due process requires the enactment of State legis-

lation authorizing evidence depositions in criminal cases for potential witnesses who may be unable to testify at the trial; (2) whether defendant was denied inspection of police records for impeachment purposes in violation of due process; and (3) whether identification of defendant was so unsatisfactory as to justify a reasonable doubt of his guilt.

From the record, it appears that on Saturday, May 21, 1966, Betsy Field, age 9, was playing in the school recreational area with her twin brother, Ricky, and Michael Hoffman, age 7. They were approached by a man whom they all described as having dark hair, tattoos on his arms and wearing dark pants and pointed-toe shoes. The children testified, in substance, that the man under the guise of playing a game with them by making body imprints in the sand, pursuaded Betsy to perform an activity sexually gratifying to him. He made her lie on her stomach on the ground while he sat on her buttocks and placed his privates between her legs, with the result that her slacks became wet in the crotch area. After that he left and did not return.

The police were notified about the episode that same day and discussed it with Michael's mother at the Hoffman home. Betsy's father testified that in the early afternoon of that day he observed a wet spot on the leg of her slacks, that she had trouble going to sleep that night, and that he had a conversation with Betsy and Ricky about the incident either the following Sunday or Monday. An arrest was made of a man fitting the description given by the children, and two separate line-ups were conducted at the Lake County jail. The first was held on August 19, 1966. Officer Verbecke telephoned in advance for the line-up to be arranged, and brought Michael Hoffman to the jail where he viewed a line-up of five prisoners through a small window in a steel door. According to the testimony of the officer, Mike said, "That's him, that's the man," pointing to the defendant.

Michael testified that he was positive that defendant was the man he saw in the school yard, and described the particular tattoos on his arms. However, defendant's former wife, who was also at the jail at that time, and who sat on the same bench while they waited for the line-up, testified that Mike said, "I think it could be that one, but I don't know."

A second line-up was held at the jail on August 25, 1966, at which Betsy and Ricky Field made identifications. There were three prisoners besides defendant in that line-up: Lockart, Harbin and Hernandez. The latter, like defendant, had dark coloring and tattoos on his arms. At that line-up Betsy was lifted up to the window in the door by the officer in order to view the prisoners. There was some confusion in her testimony but she stated that she recognized the defendant in that line-up and pointed him out. Her identification of defendant at that time is corroborated by the testimony of her father and the police officer. However, Hernandez, who participated in the line-up, testified he heard her say from behind the steel door, "I think that's him."

At this second line-up, according to Ricky's testimony, his father held him up to the window and he thought it was the man on the left but he wasn't sure. After his father picked him up a second time he knew it was the "guy on the right" because of his face and particular tattoos. According to the defendant's testimony, during this line-up he was the second from the left as they were viewed. His testimony would not put him on the far right of the group being viewed as the words "guy on the right" might indicate. However, it did put him on the right of the inmate originally pointed out. While there might be some confusion as to what Ricky meant by the "guy on the right", at trial he made another identification of defendant which he felt was positive.

Lockart, an inmate, who appeared in the second line-up,

testified that he saw Ricky through the small window in the door and that the boy shook his head, "no"; and defendant testified that he heard Ricky answer, "No, I don't know" when asked, "Do you know anyone."

Defendant denied committing the acts, and claimed that he was at Paddock Lake, Wisconsin, on that Saturday morning. His alibi was partly corroborated by his former wife who recalled that on "Saturday May 20th" she, defendant and his daughter were at her parents' cottage in Paddock Lake, Wisconsin. Defendant's alibi was also corroborated in a measure by his former father-in-law who testified that he saw defendant at the cottage on Sunday the 22nd.

Evidence in aggravation and mitigation revealed that defendant had been convicted of the crime of indecent liberties under Wisconsin law in 1964 and committed to the Wisconsin State Department of Public Welfare.

Defendant first contends that the constitutional concept of due process is violated because Illinois failed to enact a law for taking evidentiary depositions in criminal cases in the event the witness is not available at the time of trial. This court is cognizant of the expansion in procedural due process in the cases cited by defendant, recognizing defendant's right to counsel at the time of incriminatory interrogations (*Miranda* v. *Arizona,* 384 U.S. 436, 16 L. Ed. 2d 694, 86 S. Ct. 1602), or during confrontations (*United States* v. *Wade,* 388 U.S. 218, 18 L. Ed. 2d 1149, 87 S. Ct. 1926), and his right to be furnished evidence favorable to him in the possession of the prosecution (*Brady* v. *Maryland,* 373 U.S. 83, 10 L. Ed. 2d 215, 83 S. Ct. 1194; *Jencks* v. *United States,* 353 U.S. 657, 1 L. Ed. 2d 1103, 77 S Ct. 1007). However, we find no precedents in the case law requiring the State to enact a law authorizing and prescribing procedures for taking evidentiary depositions in criminal cases, or holding that the failure of a State to enact such laws constitutes a denial of due process.

Defendant claims further that failure to adopt a provision comparable to the Federal rule applicable to depositions in criminal cases (Title 18, Rule 15, U.S.C.A. 1969) is a denial of due process. Such rules have not been extended to State courts, and do not ordinarily involve constitutional dimensions. *United States* v. *Augenblick,* 393 U.S. 348, 356, 21 L. Ed. 2d 537, 89 S. Ct. 528.

From a careful review of the record, there is no showing that Harbin was either dead, outside the United States, or even that he was unable to appear if subpoenaed at the time of the trial. All that appears is that at the time of taking the deposition he was in the stockade at Fort Sheridan, Illinois awaiting orders to go to Fort Lewis, Washington. From the contents of the deposition, submitted as an "offer of proof", it is evident that Harbin's statements, which were honeycombed with hearsay, and violations of other rules of evidence, were merely cumulative of what the other witnesses who were in the line-up stated, respecting the children's identifications. In no way could that deposition be deemed "necessary in order to prevent a failure of justice". Hence, even if Federal Rule 15 were deemed to embody a constitutional right, since the deposition submitted by defendant failed to meet the criteria of the Federal rule, we cannot perceive any violation of such right.

Defendant contends further that his right to due process was violated by the court's refusal to allow his counsel to inspect police reports for impeachment purposes. To invoke the constitutional right to production of witnesses' prior statements from police reports for impeachment purposes, proper preliminary foundation must be established showing the existence of such specific statements. *People* v. *Cagle,* 41 Ill.2d 528, 532; *People* v. *Golson,* 37 Ill.2d 419; *People* v. *Durso,* 40 Ill.2d 242, 250. In *Golson,* the court noted, at p. 422, "We know of no case which has been reversed for failure to produce a statement without some preliminary

showing that such a statement exists." The record here merely shows that there were conversations between the children and the police when the alleged crime was being investigated. The existence of any written statements was never established, nor was it shown that such reports were "in the witness's own words or substantially verbatim." (*People* v. *Durso*, 40 Ill.2d 242 at 250.) Moreover, the request for the reports was made after all testimony of the principal witnesses had been submitted, and after the time had passed for cross-examination of such witnesses on the basis of such reports.

Unlike *People* v. *Wolff*, 19 Ill.2d 318, 328, cited by defendant, defense counsel here was not impeded from establishing a foundation by any ruling that he could not see the statement, even if its existence were established. Nor is the situation here analogous to *People* v. *Cagle*, 41 Ill.2d 528, 532, also cited, where access to the police report was given defendant, but he was precluded from using it on cross-examination because it exceeded direct examination.

Under the circumstances here we find the refusal to grant defendant's request for "the records of the Highland Park Police Department concerning any statements taken from the three witnesses that have testified here today" did not violate constitutional rights. There is nothing in *Cagle* which converts the general "fishing expedition" of police records requested by defendant's counsel here into a constitutional right.

Defendant's final contention is that the circumstances surrounding the pretrial identification of the defendant render the in-court identification doubtful, and cause reasonable doubt as to his guilt. The cause was tried prior to *United States* v. *Wade*, 388 U.S. 218, and the standard defined by the United States Supreme Court, to determine whether a line-up violates the due process concept, is whether, from the "totality of circumstances", it appears

that the line-up was "unnecessarily suggestive and conducive to irreparable mistaken identification." (*Stovall* v. *Denno*, 388 U.S. 293, 18 L. Ed. 2d 1199, 87 S. Ct. 1967.) Confrontation here was conducted not by showing suspects singly but rather at a line-up. Moreover, that line-up included several other persons, at least one of whom also bore tattoos and had similar hair and skin coloring to the defendant. The principal identification witnesses were three children, the eldest of whom was 9½ years old. The record shows that despite their obvious nervousness, they were trying to answer the questions honestly, and that at least two of them had recognized defendant at the line-up. They mentioned special features about his appearance, which were the basis of such identification. The children's testimony respecting their prior identification of defendant in the line-ups was corroborated by the adults standing beside them as they were held up to the window in the steel door to view the line-up. Those identifications were contradicted in some measure by the testimony of the defendant and the men in the line-up, and by defendant's alibi evidence. It was for the trial judge who heard and saw the children, the defendant, and the other witnesses to evaluate the weight and credibility of their testimony. The insufficiency of the identification will not require reversal unless it is so unsatisfactory as to justify a reasonable doubt of defendant's guilt. (*People* v. *Ortega*, 5 Ill.2d 79; *People* v. *Keagle*, 7 Ill.2d 408; *People* v. *Maffioli*, 406 Ill. 315). From our review of this record, we fail to perceive any such doubt, and, therefore, find no reason to set aside the finding of guilty by the trial judge.

Accordingly, the judgment of the trial court is affirmed.

*Judgment affirmed.*