THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* JOSEPH L. WITHERSPOON, Defendant-Appellant.

First District (1st Division)    No. 77-1825

Opinion filed February 20, 1979.—Rehearing denied March 14, 1979.

Ralph Ruebner and Gordon Berry, both of State Appellate Defender's Office, of Chicago, for appellant.

Bernard Carey, State's Attorney, of Chicago (Paul P. Biebel, Jr., Stuart D. Gordon, and James F. Henry, Assistant State's Attorneys, of counsel), for the People.

Mr. JUSTICE O'CONNOR delivered the opinion of the court:

Joseph L. Witherspoon (defendant) was charged with rape, deviate sexual assault and three counts of aggravated kidnapping. The State dismissed the deviate sexual assault and aggravated kidnapping with intent to commit deviate sexual assault charges and proceeded to trial on the remaining counts. After a bench trial, defendant was found guilty of rape and aggravated kidnapping with intent to commit rape; he was found not guilty of aggravated kidnapping while armed with a dangerous weapon and was sentenced to a term of 4 to 6 years on the two counts on which he was found guilty, with the sentences to run concurrently. Defendant appeals, contending that he was denied a fair trial because the State failed to disclose complainant's pretrial oral statement to an assistant prosecutor.

Complainant testified that on August 11, 1976, she arrived home at 7:30 p.m. after class at Prairie State College. Although she was married and lived with her husband, no one was home with her. Around 2 a.m., she received a telephone call informing her that her godmother had been admitted to St. James Hospital in Chicago Heights, Illinois, for treatment of a drug overdose. Shortly thereafter, complainant began walking to the hospital from her home in Steger because her husband had the car. She walked east on Steger Road to Chicago Road. As she passed the Steger police station, a uniformed officer asked her if he could assist her or should he call a cab. Because she had no money, she told him no. When she reached Chicago Road, complainant walked on the side of the road. When a car skidded to an abrupt halt beside her, she stopped to ask the driver what his problem was. Defendant got out of the car, pointed a gun at her and told her to get in the car. He said he would not hurt her if she got in the car. He put the gun under his seat. She told the man, whom she identified at trial as the defendant, that she only wanted to see her godmother.

She started to cry when defendant put his arm around her. He reached for the gun when she tried to move away from him. Defendant told her he had just robbed a gas station, where he had hurt somebody. He said he had just been released from jail, where he had been raped by six men. As he drove, he had his arm around her and tried to kiss her. When she tried to pull away from him, he reached down under the seat.

He drove very fast past the police station. She was worried she would get hurt if the police chased them. Defendant said he would have to kill the police. He ran the red light at the corner of St. James Hospital. He went toward Bloom High School, turned right and drove to the end of the street by the woods. Defendant parked in a deserted area with trees. After he turned off the lights and locked her door, he sucked on her neck and put his hand under her sweater. He attempted to reach into her pants. She resisted, but told him she would take off her pants because they were tight; he was tearing them. He said he did not want to use the gun when she struggled. He told her to get into the back seat, so she did. After she took off her clothes, he removed his blue jeans and gas station jacket, but left on his tee shirt. Although he penetrated her twice, defendant did not have an orgasm. When he told her to suck his penis, she became even more frightened. Defendant dropped her off at the emergency entrance to St. James Hospital and left. She ran to the security guard. She tried to get defendant's license number and wrote it down the best she could. She entered the hospital and told the security guard and a nurse that she had just been raped. Defendant was not her husband; she did not consent to intercourse with him.

On cross-examination, complainant testified that when defendant got out of his car he pointed the gun in her face and asked her to get in the car. She never saw the gun after that. She also stated that when she took so long unbuckling her belt, he reached down for his gun. At that point she undid her pants. She further testified that her husband was not home when she left for the hospital. She did not speak to the police about some statement her sister made. Complainant did not recall telling police officers that she had argued with her husband prior to going to the hospital. However, when it was explained to her that prior meant before, she stated that she had told Officer Kazminski of the Chicago Heights Police Department that she had argued with her husband. She had not told Officer Wolff that she had argued with her husband about going to the hospital. She stated that her godmother was in the hospital four or five days. Defendant had been drinking beer and he was intoxicated.

Sam Pavesich, a detective for the Chicago Heights Police Department, testified for the State. He investigated the incident in which complainant and defendant were involved. The complainant's godmother was admitted to St. James Hospital on August 12, 1976. On November 24, 1976, he interviewed defendant who, after being advised of his rights, made a written statement in which he stated that on or about the 12th of August, 1976, at around 3 a.m., he was driving north on Chicago Road in a 1975 Olds Cutlass, silver, when he noticed a young woman walking along the road. He stopped alongside her and she came over and got into the car. He asked her where she was going and she told

him she was going to the hospital because her godmother had had a heart attack. He offered her a beer and they began to talk. He told her that he had just gotten out of jail and had robbed a Clark gas station. She said that she was glad because she didn't like the attendant at the station because of something they had done to her at one time. By that time he and the woman were drinking another beer and she asked him why he had been in jail and whether he knew her brother who was in jail. He said he did not.

He also told her he had a gun under the back seat. She asked why he had robbed the gas station and he said that he could get put back in jail for doing it. By that time they were at the hospital and she told him to drive around a while. He went down by Bloom High School, parked the car and they sat there drinking. He told her that he had been raped while he was in jail. She told him her brother told her such things did happen.

Defendant put his arm around her and told her he had not had a woman in six months and would like to have sex with her. She said she was a married woman and that she didn't know him well enough, but did not make a move to take his arm away. He then kissed her and began playing with her breasts. After a few minutes he asked her to get in the back seat. She said she was scared of him because of the gun. He asked her if she wanted to see it; she did not.

Defendant then began to try to unzip her pants and she told him she would do it because she didn't want it ripped. She then took off her pants and her panties. They began kissing; she put her arm around his neck. He asked her again if they could get into the back seat. They both did and began to have sex, but he was too drunk to finish it. He got up and she was having trouble breathing. She told him she had asthma and had a spray or something in her purse. He got the purse from the front of the car, but could not find anything in it. She asked him to roll down the window, which he did. They got dressed and she said she was sorry she could not help him with his problem; she didn't know him well enough. He told her it was not her fault, but because he was drunk. He then asked her if she wanted to go to the hospital and she said she did. He took her to the hospital; they kissed when she got out of the car. He asked her if she wanted another beer. She took another beer and he drove her up to the door and left.

On cross-examination, Pavesich testified that defendant told him he had not robbed a gas station; that he was "conning" the complainant. He (Pavesich) did not ask defendant whether he owned a gun. Pavesich further testified that complainant did not tell him that she had an argument with her husband.

The State and the defendant stipulated that Dr. Adolph, if called to testify, would state that he treated complainant at St. James Hospital on

August 12, 1976. She told him she had been abducted and had been raped near the high school in Chicago Heights, Illinois. The assailant had penetrated her vagina without ejaculating.

It was also stipulated that Carmel Roman, the records supervisor at St. James Hospital, would testify that complainant's godmother was admitted to the hospital on August 12, 1976, and was discharged August 13, 1976.

Defendant testified that he left work shortly after midnight August 12, 1976, and went to Val's Tap in Steger, Illinois. He drank eight bottles of beer and bought a six-pack of beer to go. At about 3 a.m., he left Val's; he drove down Chicago Road, where he saw complainant walking on the side of the road. He pulled beside her and stopped. She looked in the window, came over and got in. He did not know what he intended to do when she entered the car. Defendant told complainant he had just gotten out of jail. He had robbed a gas station. Complainant said that if it was the Clark station she was glad. When he offered her a beer, she accepted; he reached down to get her a beer. She said she was going to St. James Hospital to see her godmother. He told her there was a gun in the back seat. Upon approaching the hospital, he asked her where she wanted to go. She wanted to drive around to finish her beer. He parked the car near the high school football field. He intended to have sex with complainant. She told him she was a married woman who did not know him well, but she did not take his arm off her. While they drank beer he kissed her; she put her arm around him and kissed back. When he tried to unzip her pants, she said she would unzip them because she did not want them to be torn. After she removed her pants, he fondled her and asked her to go to the back seat; she did. He went with her, got on top of her and penetrated her. She offered no resistance. He did not have an orgasm, so he asked her to suck his penis. She said she would not. He penetrated her again, but did not ejaculate. Complainant was breathing heavily; she said she was asthmatic and needed some pills in her purse. When she calmed down, she dressed. He took her to the hospital. Upon exiting the car, she kissed him and took a can of beer.

On cross-examination, defendant testified that he remembered more about the incident at the time of trial than he did when he gave his statement, although the trial was more than one year after the occurrence and the written statement was given only three months after it. He first saw the complainant when she was walking on Chicago Road. He stopped his car beside her, not behind complainant as she had stated. She got into his car without a word being exchanged. When she got in, he asked her where she was going. She was going to the hospital to see her godmother. She did not look like a prostitute. After he gave her a beer, he told her about robbing a gas station and getting out of jail. He drank 10

beers before he had intercourse with complainant. That made him too drunk to climax, but not too drunk to remember the details of the incident. At first he was only going to help her get to the hospital. The stories about jail, robbery and the gun were to impress complainant. He did not have a gun with him. Defendant was five feet ten inches tall and weighed 210 pounds; complainant was slightly built and approximately five feet four inches tall. After she calmed down, she said she wanted to go. He drove her to the hospital emergency room.

Roland Wolff, a Chicago Heights police officer, testified for the defendant. While on duty on August 12, 1976, he interviewed the complainant concerning the occurrence in question. Complainant told him that she had argued with her husband about her seeing her godmother at the hospital. After the argument, her husband left their home. Then she left for the hospital.

Under cross-examination, Wolff testified that he interviewed complainant and several other persons at the hospital on the morning of August 12, 1976. He summarized the information received from several people in his report on this incident. Prior to his testimony, he had admitted he did not remember the exact conversations he had with people he interviewed at the hospital. His testimony concerning these conversations is based upon his police report. His report is a summary of what several people told him.

Wolff stated on redirect that he attempts to remember conversations verbatim in his reports. When he summarizes, he compacts the material on which he is reporting. The complainant said she had argued with her husband about her seeing her godmother and his late hours.

On re-cross-examination, Wolff testified that he had no independent recollection of the conversation; he was testifying from his report of it.

After arguments, the trial court found defendant guilty of rape and aggravated kidnapping with intent to commit rape.

A hearing was held on defendant's motion for a new trial, at which LeVonne Hughes, the security guard at the emergency entrance to St. James Hospital, testified that he saw a female standing outside the emergency room. She was repeating a license number and had a can of beer in her hand. She asked him to write down the license number, which he did and gave it to her. Her first statement to him was that a man had just raped her. He took the can of beer from her, poured the beer out, threw the can in the garbage can and directed her to admitting. She was not screaming or crying. She told him she was going to meet a relative there. She further said she had had an argument with her husband and he wouldn't bring her and she was walking and was picked up by a gentleman, taken to a certain area and was raped.

On cross-examination, he testified that the first words out of her

mouth were that a man had just raped her. The can of beer she was holding was open and about two-thirds full. He didn't see her drink any of the beer. She didn't appear intoxicated. She was not confused; maybe, surprised. He would say she appeared somewhat in shock.

The trial court denied the motion for a new trial and, after a hearing in aggravation and mitigation, sentenced the defendant.

Prior to trial, defendant had served on the State a supplemental discovery motion which, in substance, asked the State to notify defense counsel if it became aware of any State witnesses changing or recanting their positions or statements from those made to the police as described in the police reports. Prior to trial, complainant told the assistant state's attorney she was home alone when called to the hospital. She so testified on direct examination. On cross-examination, she admitted that she told Officer Kazminski that she had argued with her husband before going to the hospital. Officer Wolff testified that complainant told him she argued with her husband about her going to the hospital. The assistant state's attorney was aware of the statements which the police reports attributed to her.

Defendant's only contention on appeal is that a new trial should be granted because the State's failure to disclose a statement complainant orally gave to an assistant state's attorney constitutes reversible error for the reason that it violates the rules of discovery. In support of his contention, defendant argues that the State has a duty to supplement discovery, especially where the information tends to negate defendant's guilt and a request for recantation of a prior version of the witness' story is involved. The State responds that only written statements or substantially verbatim reports of statements are discoverable. It had no obligation to reduce oral statements to writing and, even if discoverable, the request here was general, not specific; therefore, constitutional error was committed only if the omitted evidence created a reasonable doubt of guilt which did not otherwise exist.

■■■ The right to production applies to written or recorded statements, substantially verbatim reports of witnesses' oral statements and to a list of memoranda reporting or summarizing their oral statements. (Ill. Rev. Stat. 1977, ch. 110A, par. 412; see Historical and Practice Notes, Ill. Ann. Stat., ch. 110A, par. 412, at 683 (Smith-Hurd 1976).) Defendant must make a preliminary showing of the existence of such statements. (*People v. Galvin* (1970), 49 Ill. 2d 37, 273 N.E.2d 356; *People v. Wilson* (1975), 32 Ill. App. 3d 842, 336 N.E.2d 92.) Additionally, it must be shown that the statement is in the witness' own words or substantially verbatim. (*People v. Durso* (1968), 40 Ill. 242, 239 N.E.2d 842, *cert. denied* (1969), 393 U.S. 1111, 21 L. Ed. 2d 807, 89 S. Ct. 923.) Although defendant contends that the State's failure to disclose the complainant's oral statement violates his

rights to discovery guaranteed by the supreme court rules and by the Constitution, no evidence was produced to show the existence of any reports in the witness' own words or substantially verbatim. The rules of disclosure do not impose on the State a duty to reduce complainant's oral statement to writing. (*People v. Abbott* (1977), 55 Ill. App. 3d 21, 370 N.E.2d 286.) On this record there is no violation of the State's duty to disclose. See *People v. Gaitor* (1977), 49 Ill. App. 3d 449, 364 N.E.2d 484.

■■ In considering whether the alleged error is of constitutional magnitude, it is necessary to consider the nature of the request made by defendant. If the request was specific, the failure to respond is "seldom, if ever, excusable." (*United States v. Agurs* (1976), 427 U.S. 97, 49 L. Ed. 2d 342, 96 S. Ct. 2392.) However, if the request was general, then there is constitutional error if the omitted evidence creates a reasonable doubt that did not otherwise exist. (*Agurs.*) Defendant's supplemental motion for discovery requested:

> " * * * that this Court enter an Order upon the State providing that the State inform the defense prior to trial of the contemplated change, deviation or denial of a witness' or witnesses' previous statement, position or assertion. Further, that if the State is aware of a witness' change or retreat or denial of a position, statement or conduct previously attributed to him or her but feels that the matter is not discoverable by the defense, that the State notify the Court of this matter and permit the Court to conduct *in camera* investigation; said investigation being spread upon a record and that this Court, if it should not order disclosure, spread upon the record that it has received information which it does not feel can be reached through discovery and impound that portion of the record for purposes of appeal."

In *People v. Fitzgerald* (1977), 55 Ill. App. 3d 626, 370 N.E.2d 1207, the court, applying *Agurs,* stated that a request to be informed whether any person had identified " 'anyone other than the accused as the perpetrator or participant' " was a general request. (55 Ill. App. 3d 626, 631, 370 N.E.2d 1207, 1211.) Defendant in this case made no specific demand in the supplemental motion for discovery.

The question becomes whether the omitted evidence creates a reasonable doubt which did not otherwise exist. The inconsistencies in complainant's statements were presented to the trier of fact. Complainant's credibility was put in issue by the testimony regarding her statements concerning an argument with her husband. We find no reason to disturb the trial court's conclusion on complainant's credibility. (See *People v. Walker* (1977), 47 Ill. App. 3d 737, 365 N.E.2d 428.) Complainant's statement did not create a reasonable doubt that did not otherwise exist.

Defendant further argues that a statement by the trial court that he saw no significance in the argument between complainant and her husband constitutes separate reversible error. (*People v. Bowie* (1976), 36 Ill. App. 3d 177, 343 N.E.2d 713.) In *Bowie*, defendant's conviction was reversed and the cause remanded because at the time the trial judge rendered judgment the record affirmatively indicated that he did not remember or consider evidence that the defendant's head was bleeding in a battery prosecution where an issue was self-defense. Here, during the trial the trial court merely stated that the testimony was not significant. There was no failure to recall or consider testimony as in *Bowie*. In this case the record affirmatively indicates that when rendering his decision the trial court addressed himself to the testimony and made his judgment based on it. The trial court's statement does not constitute reversible error.

The convictions and sentences are affirmed.

Affirmed.

McGLOON and CAMPBELL, JJ., concur.