(No. 33774.—

THE PEOPLE OF THE STATE OF ILLINOIS, Defendant in Error, *vs.* ROBERT HARRIS, Plaintiff in Error.

*Opinion filed March 22, 1956—Rehearing denied May 22, 1956.*

432

McDonnell & McDonnell, of Chicago, for plaintiff in error.

Latham Castle, Attorney General, of Springfield, and John Gutknecht, State's Attorney, of Chicago, (Fred G. Leach, Edwin A. Strugala, Irwin D. Bloch, John T. Gallagher, Rudolph L. Janega, and William L. Carlin, of counsel,) for the People.

Mr. Justice Daily delivered the opinion of the court:

Defendant, Robert Harris, was indicted in the criminal court of Cook County for the crime of murder. However,

at the jury trial which followed, he was convicted of voluntary manslaughter and sentenced to the penitentiary for a term of 14 years. On writ of error, he now contends (1) that the trial court erred in submitting manslaughter instructions for jury consideration; (2) that the verdict was contrary to the evidence, and (3) that the lower court erred in unduly restricting his direct and redirect examination.

The record discloses that on the night of September 18, 1954, James Ellis, the deceased, was employed as a "bouncer" by the Tan Club Tavern, which was located at 2922 West Madison Street in the city of Chicago, and, as such, was wearing a blue uniform and star similar to those of a police officer, and was carrying both a night stick and a holstered gun. Sometime around midnight, the defendant entered the tavern, walked to the rear, and commenced talking with some friends. For some unexplained reason, he was almost immediately accosted by Ellis and ordered to leave the premises, and when he refused to do so, he was severely beaten with the night stick and forcibly evicted. After a lapse of time, the duration of which is in dispute, defendant reappeared at the tavern entrance and fired one shot from a .32 caliber automatic which struck Ellis in the back, resulting in his almost immediate death. Thereupon, the defendant fled from the scene on foot but was pursued and apprehended a few blocks away.

Although all the witnesses agreed that the shooting took place at approximately 12:30 A.M., they were in disagreement as to the time of the prior incident. The testimony of the People's witnesses indicated that the beating occurred around 11:45 P.M. while the witnesses for the defense stated that it took place almost thirty minutes later. The defendant himself testified that he entered the tavern at approximately 12:15 A.M. on the morning of September 19 and was attacked by the deceased without reason. Upon being evicted from the tavern, he walked a short distance

down the street and sat on the fender of a parked automobile, where he was found by an acquaintance known only as George Jones who suggested that they return to the tavern to see why he had been beaten. The defendant agreed, and as they approached the tavern entrance, Jones handed him a gun, whereupon the defendant then stepped into the doorway and beckoned for Ellis to come outside. According to the defendant's testimony, Ellis turned to face the door, took one or two steps towards the defendant, and then reached for his gun. At that instant, defendant fired the fatal shot. Although an eyewitness swore that Ellis was shot in the back while standing at the bar talking to friends, the defendant describes the shooting as follows: "When he reached for his gun, that is when my gun went off. That was when I fired one shot * * *. When I brought this gun up I did not know I was pulling the trigger. When I went to the Tan Club entrance I did not intend to shoot anybody. I went there to find out why he hit me." Based upon this testimony, instructions as to both accidental shooting and the right of self-defense were given at the request of the defendant. It is now contended, however, that the court erred in giving manslaughter instructions which were tendered by the State.

We have long held that if there is any evidence in the record which, if believed by the jury, would reduce a charge of murder to manslaughter, an instruction defining that crime should be given. (*People* v. *Brown,* 415 Ill. 23; *People* v. *Newman,* 360 Ill. 226; *People* v. *Beil,* 322 Ill. 434; *People* v. *Tokoly,* 313 Ill. 177.) In cases of voluntary manslaughter, this evidence must consist of facts which would indicate that a serious and highly provoking injury was inflicted upon the defendant which would be sufficient to excite an irresistible passion in a reasonable man, or that an attempt was made by the deceased to inflict a personal injury, and that the killing resulted from the violent passion before sufficient time had elapsed

for the voice of reason to return. (*People* v. *Smith,* 404 Ill. 350; *People* v. *Bissett,* 246 Ill. 516; Ill. Rev. Stat. 1955, chap. 38, par. 362.) What constitutes a sufficient "cooling-off period" depends upon the extent to which the passions have been aroused and the nature of the act which caused the provocation (26 Am. Jur., Homicide, sec. 24), and, for that reason, no yardstick of time can be used by the court to measure a reasonable period of passion but it must vary as do the facts of every case. Humans react violently to the infliction of a serious injury, and the degree of pain which results therefrom not only governs the passion itself but also influences the duration of the cooling period. Here, according to the defendant's own testimony, he was beaten to such an extent that he did not know where he was or who assisted him from the tavern, and within 15 minutes after the assault, while still bleeding, he returned to the tavern and fired the fatal shot without realizing that he had even pulled the trigger. He further testified that for a period of two weeks following his arrest, he could not chew solid food but was on a strict diet of sweet milk and eggs. These statements of the defendant as to the severity of his injuries, are corroborated by jail records in evidence which indicate that at the time of defendant's admission, his bruises and lacerations were of such a nature that both the jail warden and physician suspected a possible fracture of the jaw and cheek bones. What has been held to constitute a reasonable cooling-off period in instances where no prior injury was at any time inflicted upon the defendant cannot govern that duration under facts similar to those of the present case. Thus, *People* v. *Newman,* 360 Ill. 226, which is heavily relied upon by counsel for the defense, is not controlling. In view of the evidence of the severe beating and other provocatory circumstances which so closely preceded the shooting, it is our opinion the trial court was justified in submitting to the jurors' consideration, the question of

whether the killing resulted from an irresistible impulse before defendant's passion had cooled and before his voice of reason had returned. Accordingly, we hold that the court did not err in giving the manslaughter instructions now complained of.

Neither do we believe the verdict was contrary to the evidence presented. Although there were facts in the record which might indicate that the defendant was guilty of murder, there was also evidence to support the manslaughter theory. The jury and trial judge observed the witnesses, heard them testify, and were in a much better position to determine their credibility than a court of review. This court will reverse because of insufficient evidence only where that evidence is so palpably contrary to the verdict, or is so unreasonable, improbable, or unsatisfactory as to raise a reasonable doubt of the defendant's guilt. (*People* v. *Smith,* 404 Ill. 125.) This is not true of the present case.

The defendant finally contends that the lower court erred in unduly restricting his right to testify as to his state of mind at the time of the shooting. On direct examination, he was asked (1) "At the time that the deceased reached for his gun out of his holster, did you then reasonably fear that you were in immediate danger?" and (2) "Did you have any fear of the deceased going to shoot you?" On redirect examination, the defendant was also asked: "Were you then in fear of receiving great bodily harm or being killed?" The State objected to each of these questions as leading and, on each occasion, the objection was sustained.

In such cases the defendant's state of mind is material and a proper subject of examination, (*People* v. *Biella,* 374 Ill. 87; *People* v. *Scott,* 284 Ill. 465; *Wohlford* v. *People,* 148 Ill. 296,) yet this does not warrant the use of leading or other improper interrogatories. (*People* v. *Bennett,* 3 Ill.2d. 357.) In the present case, not

only did the questions lead the witness by indicating the answer desired, (*People* v. *Schladweiler,* 315 Ill. 553; *Peebles* v. *O'Gara Coal Co.* 239 Ill. 370,) but they also required conclusions as to the reasonableness and degree of fear which were more properly within the scope. of jury determination. The trial court's ruling sustaining objections to these questions in the form in which they were asked was correct. Having been restrained from asking improper questions, defendant's counsel voluntarily abandoned any further interrogation dealing with the point. There is, thus, nothing in the record to show defendant was, or would have been, prevented from giving testimony as to his fears and beliefs in response to proper questioning. On the state of the record, therefore, there can be no merit to the contention that examination of defendant was unduly or erroneously restricted in this regard.

The judgment of the criminal court of Cook County is affirmed.

*Judgment affirmed.*