THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.*
MICHAEL AKINS, Defendant-Appellant.

First District (5th Division)    No. 61373

Opinion filed June 25, 1976.

James R. Streicker and Steven Clark, both of State Appellate Defender's Office, of Chicago, for appellant.

Bernard Carey, State's Attorney, of Chicago (Laurence J. Bolon, Michael E. Shabat, and Larry L. Thompson, Assistant State's Attorneys, of counsel), for the People.

Mr. JUSTICE BARRETT delivered the opinion of the court:

Defendant Michael Akins was found guilty of murder, attempt murder and aggravated battery in violation of sections 9—1, 12—4 and 8—4 of the Criminal Code (Ill. Rev. Stat. 1971, ch. 38, pars. 9—1, 12—4 and 8—4) in a jury trial in the circuit court of Cook County. He was sentenced to the penitentiary for not less than 20 nor more than 30 years for murder; not less than 4 nor more than 12 years for attempt murder; and not less than 3 nor more than 9 years for aggravated battery with all sentences to run concurrently.

On appeal defendant contends: (1) he was not proven guilty beyond a reasonable doubt; (2) his murder conviction should be reduced to voluntary manslaughter; (3) the jury should not have been given an instruction on flight; (4) the trial court erred in entering judgment and sentence on the jury verdict of guilty of aggravated battery.

On the evening of August 20, 1971, at approximately 7:30 p.m. a small group of people gathered in front of the residence at 134 East 105th Street, Chicago, Illinois to converse and pass the time. Defendant, who emerged from a nearby alley, exchanged words with Charles Redmon, whereupon they began fighting and wrestled to the ground. Friends and relatives, including George Redmon, Charles' brother, and Helen Rimmer, defendant's mother-in-law, attempted to break up the fight and finally succeeded in forcibly pulling them apart. Shortly thereafter defendant drew his handgun, and fired shots seriously wounding George

Redmon and killing Charles Redmon. Two conflicting versions of the shootings were presented to the jury.

George Redmon testified for the State that he was in front of his aunt's property at 134 East 105th Street when he saw the defendant come out of the alley adjacent to the property. Charles Redmon, the deceased, and defendant began talking. After some name calling, Charles attempted to hit defendant but missed. Defendant grabbed Charles and they wrestled to the ground near the curb of the street. George attempted to pull defendant from Charles. Finally, Welborn Freeman pushed George away and Mrs. Chatman (Helen Rimmer) separated Charles and defendant. Charles was lying on the ground and defendant rose to his feet. At that point George turned around and noticed defendant pointing a gun in his direction. George started to run but was shot in the back. The bullet caused him to spin around and he fell to the ground on his back. George further testified that he heard the gun repeatedly fire before defendant shot him again, this time in the leg.

Patricia Driskell testified for the State that when she reached the altercation the defendant was positioned on top of Charles and several people were attempting to break up the fight. When the parties had been separated she bent down over Charles, who was still on the ground, and told him that the fight was over and asked him to come into the house. Then she heard the shots. She looked up at the defendant and observed "sparks coming from his hand." She saw the gun and began to run back to the house. Charles was about seven or eight feet from defendant when the shooting began. She heard a total of six shots.

Welborn Freeman, the brother of Patricia Driskell, testified that Mrs. Chatman asked him to stop the fight. He pulled George from the defendant and thrust him towards the sidewalk fence. As George was getting up off the ground the first shot was fired. He said he turned around and observed that defendant was aiming a pistol at George. Defendant shot George, turned to his left and shot Charles, who was still on the ground, and then turned back to his right and again shot George. Six shots were fired.

Donald Rimmer (a/k/a Donald Chatman) testified for the defense that the defendant was positioned atop the deceased who was striking defendant in the face saying he would kill him. He said he saw Patricia Driskell with a kitchen knife saying "hold him, I will stab him." He pushed her away and helped to break up the fight. His mother, Helen Rimmer, was able to get defendant to his feet. As she was leading the defendant away Welborn Freeman charged the defendant shouting, "Hold it * * *, I am going to kill this * * *." Welborn was three feet away when defendant turned and fired his gun and he used the deceased

as a shield when the shooting began. He further testified that he did not see Welborn with a gun or a knife.

Helen Rimmer (a/k/a Helen Chatman), defendant's mother-in-law, testified for the defense that she picked the defendant up and began taking him home when Welborn Freeman ran up behind defendant threatening his life. Defendant rapidly turned around and started shooting. Welborn then picked Charles up using him as a shield. About two or three minutes elapsed from the time Mrs. Rimmer attempted to end the fight to the time the shots were fired.

Defendant testified that he was 21 years old and had been convicted of robbery. The fight had ended when his mother-in-law pulled him up. As he started for home he heard someone from behind and immediately started to fire. He did not observe a weapon or "bother" to look and see who was approaching. He further testified that he only fired his weapon when he heard someone behind him say something using the word "kill." He did not remember the exact words and did not know if the comments were directed at him, but he did remember turning half way around and shooting the gun twice. At that time he was dazed and unaware of all that was happening. After the shootings he stayed at various relatives' homes and then left for Aurora, although an attorney had advised him to surrender to authorities. He obtained a job in St. Charles using the name Larry Alexander. Within two weeks after his arrival in Aurora he was arrested by Aurora police who had observed the car he was driving stop in a no parking zone and block traffic. He told police his name was Larry Alexander, and later that it was Michael Atkins. A search of the defendant's car produced a semi-automatic .25-caliber pistol. It was stipulated at trial that test bullets fired from this weapon were similar ballistically to bullets recovered in the shooting of the Redmon brothers.

Dr. Edward Shalgos, a pathologist, was called in rebuttal for the State. He testified that he performed an autopsy on the body of Charles Redmon and noted the presence of two bullet wounds. One wound was received in the upper region of Redmon's right chest. The point of entry and the course of the bullet through the body indicated to him that the gun was held in a position over the victim. The second wound was received in the back of the victim's right chest. This indicated to him that Redmon had his back toward the person who shot him. He further stated it was most unlikely that both wounds were suffered when Redmon was standing unless the hand holding the pistol was above him.

William Jannotta, a homicide investigator for the Chicago Police Department, testified for the State in rebuttal that Mrs. Rimmer told him she was not at the scene of the shooting.

OPINION

Defendant first contends he was not proven guilty beyond a reasonable doubt since he acted in the reasonable belief that his actions were in self-defense. He argues that he was justified in using deadly force because of his belief that he was about to be assaulted.

Whether a killing is justified under the law of self-defense is a question of fact to be determined by the jury under proper instructions. (*People v. Johnson* (1969), 112 Ill. App. 2d 148, 251 N.E.2d 393.) The law allows a person to use deadly force in defense of himself if he reasonably believes that such force is necessary to prevent imminent death or great bodily harm. (Ill. Rev. Stat. 1971, ch. 38, par. 7—1.) Since self-defense is an affirmative defense, where it is raised, the burden is on the State to disprove it beyond a reasonable doubt in order to show defendant's guilt. (*People v. Warren* (1965), 33 Ill. 2d 168, 210 N.E.2d 507.) Once a jury has decided this question its verdict will not be disturbed unless the evidence is so palpably contrary to the verdict or so unsatisfactory that it justifies a reasonable doubt of the defendant's guilt. *People v. McClain* (1951), 410 Ill. 280, 102 N.E.2d 134.

■■ We believe that the evidence was sufficient to disprove beyond a reasonable doubt defendant's claim of self-defense and to justify the jury's verdicts. The State's evidence demonstrated that the defendant held the most deadly weapon at the scene. It showed that George Redmon was some distance from defendant and that he began to run when the defendant pointed a pistol at him. The evidence further showed that Charles was still lying on the ground when he was shot. Moreover, there was no claim made during the trial that either Charles or George Redmon had any weapon in his possession. Indeed, defendant admitted he did not observe a weapon at the time his alleged assailant approached him. Clearly, no threat to the defendant's life had been presented by either of the victims. Although the defense argues Welborn Freeman rapidly approached defendant from behind shouting he would kill defendant, Welborn testified he was facing the house talking to George Redmon when the first shot was fired. We hold the jury was justified in finding from the evidence that defendant did not act in self-defense.

Defendant next contends his murder conviction should be reduced to voluntary manslaughter. He argues that he was acting under a sudden and intense passion resulting from serious provocation and that a sufficient cooling off period had not passed when the shots were fired. (*People v. Johnson* (1972), 4 Ill. App. 3d 249, 280 N.E.2d 764.) In *Johnson* the court reduced defendant's conviction from murder to voluntary manslaughter stating that there was no pause in the activities of the two combatants to show that the fatal blow was attributable to malice or revenge. In the instant case, however, a pause in the altercation occurred.

Defendant testified that the fight had ended and he had started for home when he heard someone behind him. *Johnson*, then, is factually inapposite.

Defendant cites *People v. Bartley* (1914), 263 Ill. 69, 104 N.E. 1057, for the proposition that the pause in the fight did not constitute a sufficient cooling off period because only seconds elapsed between the end of the fight and the shootings. His reliance on this case is misplaced. In *Bartley* the accused and the deceased fought with fists, then with garden equipment, and finally the accused shot the deceased while the latter was about to strike him with an ax. The accused, after the exchange with the garden equipment, left the scene of the fight, retrieved a gun, and returned to the farmyard where he shot the deceased to death. In reversing the accused's conviction for murder, the Supreme Court of Illinois held that at most the conviction should have been for manslaughter. The court reasoned that there had been a serious and highly provoking injury inflicted upon the accused and an attempt to further commit a serious personal injury upon him. Moreover, the difficulty between the accused and the deceased had not terminated even though there had been a break in the fighting. Therefore, an interval of a few minutes did not constitute sufficient cooling time.

■■ Here, in contrast, when the defendant began walking away from the fight scene after the fight had ended, he reacted with deadly force to a verbal statement which he only partially heard. Admittedly, he did not "bother" to look and see who was approaching nor did he observe anyone with weapons. Although only seconds may have passed between the end of the fight and the shootings, we believe that there was a sufficient pause to permit passions to cool and the voice of reason to be heard. As stated by the court in *People v. Harris* (1956), 8 Ill. 2d 431, 435, 134 N.E.2d 315:

> "What constitutes a sufficient 'cooling-off period' depends upon the extent to which the passions have been aroused and the nature of the act which caused the provocation (26 Am. Jur., Homicide, sec. 24), and, for that reason, no yardstick of time can be used by the court to measure a reasonable period of passion but it must vary as do the facts of every case. Humans react violently to the infliction of a serious injury, and the degree of pain which results therefrom not only governs the passion itself but also influences the duration of the cooling period." (See also *People v. Walker* (1965), 55 Ill. App. 2d 292, 204 N.E.2d 594, and *People v. Hough* (1968), 102 Ill. App. 2d 287, 243 N.E.2d 520.)

Under the circumstances of this case the jury could justly determine that defendant acted without sufficient provocation.

Defendant also argues that this court should reduce the conviction from murder to voluntary manslaughter since he believed that this use of

deadly force was necessary in his own defense but that such belief was unreasonable.

■■ From the evidence presented we believe the jury was justified in finding that defendant's acts were deliberate and motivated from malice or deliberate revenge. As our Supreme Court stated in *People v. Bolger* (1934), 359 Ill. 58, 68, 194 N.E. 225:

> "The law has committed to the jury, or to the trial court where a cause is tried by the court, the determination of the credibility of the witnesses and of the weight to be accorded to their testimony, and where the evidence is merely conflicting this court will not substitute its judgment for that of the jury or the trial court."

Defendant next contends that it was error to give the following flight instruction to the jury:

> "The court instructs the jury that if the jury believes from the evidence beyond all reasonable doubt, that the defendant, immediately after the commission of the crime with which he stands charged, fled and remained away until taken into custody, such flight is a proper circumstance to be considered in determining the guilt or innocence of the defendant."

We believe that *People v. Burris* (1971), 49 Ill. 2d 98, 273 N.E.2d 605, is dispositive of this contention. In *Burris* our Supreme Court considered a similar instruction on flight. The court affirmed its use and stated they did not see how the giving of the instruction could have reasonably affected the verdict.

■■ Here, as in *Burris*, the instruction did not tell the jury that defendant had fled. It merely told them that if they found from the evidence defendant had fled then that fact could be considered in their deliberations. We also believe that there is ample evidence in the record to support the instruction. Therefore, we do not find that error was committed by giving the instruction on flight.

Finally, defendant contends that the attempt murder and aggravated battery convictions arose from a single course of conduct and he should have been convicted and sentenced only of attempt murder. In support of his contention defendant cites *People v. Steen* (1972), 9 Ill. App. 3d 488, 292 N.E.2d 513, and *People ex rel. Walker v. Pate* (1973), 53 Ill. 2d 485, 292 N.E.2d 387. *Steen* is not in point as it involved acts that occurred almost simultaneously. *Pate* is not in point either as it involved the single act of shooting the victim once.

Here, defendant first fired his weapon at George Redmon hitting him in the back. Defendant next fired a series of shots at the deceased, Charles Redmon. Then defendant turned and again fired his weapon at George wounding him in the leg.

In *People v. Harper* (1972), 50 Ill. 2d 296, 278 N.E.2d 771, the court

rejected the contention that the imposition of two separate sentences for the crimes of rape and robbery of a single victim was impermissible. The court said:

> "While it is true that the rape and robbery occurred in a series of acts committed at the same place and within a short time, it is equally true that they constituted separate acts involving different elements. As such, they were separate offenses for which concurrent sentences were both constitutionally and statutorily permissible. *People v. Johnson* (1970), 44 Ill. 2d 463; *People v. Raby* (1968), 40 Ill. 2d 392." 50 Ill. 2d 296, 302.

■■ The same reasoning is directly applicable to the instant case. The attempt murder had no necessary connection with the aggravated battery since the attempt murder was complete before George was shot in the thigh. The crimes were separate and distinct although only one victim was involved. Defendant's concurrent sentences on both the attempt murder and aggravated battery of George Redmon were therefore proper.

The judgment of the circuit court of Cook County is accordingly affirmed.

Affirmed.

LORENZ, P. J., and SULLIVAN, J., concur.