THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. JEFFREY JARVIS, Defendant-Appellant.

First District (2nd Division)   No. 85—3438

Opinion filed July 21, 1987.

---

*Justice Lewis replaces Justice Jones, who retired after the cause was taken under advisement.

Steven Clark and Barbara Kamm, both of State Appellate Defender's Office, of Chicago, for appellant.

Richard M. Daley, State's Attorney, of Chicago (Thomas V. Gainer, Jr., Paula Carstensen, and Kevin T. Byrne, Assistant State's Attorneys, of counsel), for the People.

PRESIDING JUSTICE SCARIANO delivered the opinion of the court:

Defendant-appellant Jeffrey Jarvis (Jarvis) was tried by a jury, found guilty of murder, and sentenced to 24 years in prison. On appeal, Jarvis presents the following issues: (1) whether the trial court committed reversible error by allowing witnesses to testify as to hearsay statements made by the deceased; (2) whether the State proved Jarvis guilty beyond a reasonable doubt; (3) whether the trial court committed reversible error in allowing a police officer to testify to the deceased's hearsay statements despite alleged discovery violations; (4) whether the trial court committed reversible error by refusing to submit a voluntary manslaughter instruction to the jury; and (5) whether the trial court committed reversible error by giving an accountability instruction to the jury while refusing to give defendant's instruction that mere presence at the scene of a crime is insufficient evidence of guilt. We affirm.

A review of the record discloses that at approximately 3:15 a.m. on August 4, 1983, Thomas Petty (Petty) was shot five times in his apartment at 4572 South Lake Park Avenue in Chicago. Two bullets struck his upper right arm, one penetrated his thigh, one went through his abdomen, and the fifth bullet tore through his genitals and lodged in his leg. Petty died two days later.

The testimony at trial revealed that approximately 3½ hours before the shooting, Jarvis argued with Petty outside of the latter's apartment about a $6 bag of marijuana Jarvis had purchased from him which was supposedly "short" on quantity. Petty refused to give Jarvis a refund; a fight ensued, and by all accounts, Petty got the better of

the brawl. Patricia Tate (Tate), Petty's girl friend, testified that she heard Petty and Jarvis arguing and observed Jarvis throw a garbage can at Petty. Petty, however, struck Jarvis in the head, opening a gash which caused blood to gush out over Jarvis' face. Jarvis left the premises with two friends, stating, as he was leaving, "I'll be back."

At approximately 3 a.m., Petty and Tate went to bed in the apartment they shared. Their bedroom was located approximately 20 feet from the kitchen, and the kitchen had a wooden and windowless back door, opening into a vestibule (or "hallway," as Tate described it), which in turn led to an outside porch and staircase. There was an exit light in the vestibule which provided enough illumination so that people could be seen there. Tate claimed that the light was always on.

Tate testified that they had been in bed approximately 20 minutes when Petty got up to get a drink of water. Suddenly, she heard the victim calling "Pat, Pat," from the kitchen, and when she ran to him she found Petty slumping over with blood spilling out from the front of his body. Noting bullet holes in the kitchen door, she asked Petty if he was shot by "the same dude" with whom he had been arguing earlier. Petty replied, "Yes." Tate then phoned the police.

Meanwhile, Chicago police officer Milton Hill and his partner were on routine patrol in the area of the shooting when he heard several gunshots. Shortly thereafter, he observed two men, one of whom was Jarvis, running "side by side" away from Petty's apartment building. Officer Hill sped up as close as he could to the two individuals, and when Jarvis slipped and fell, Hill's partner got out of the car and detained him. The spot where Jarvis had fallen was approximately 25 feet from a gangway which was the only way to get to the back entrance of Petty's apartment. The other person running with Jarvis escaped.

Jarvis was searched by the officers, but no weapon was discovered. Hill testified that when he asked Jarvis how he had received the cut over his eye, he claimed that he was just robbed and had been shot at, and he pointed in the direction of Petty's apartment. Jarvis could not describe the robber except to say that he wore a mask and was taller than he was. Jarvis also told Hill that he did not know the person who was running next to him. At that point, Hill did not believe he had any further cause to detain Jarvis, so he filled out a "contact card" and released him.

Shortly after resuming their patrol, the officers received word that a man had been shot at 4572 South Lake Park, and they proceeded immediately to the scene. They were met at the apartment by a police patrol which had also responded to the call. Officer Hill testified that

upon entering the kitchen, he observed Petty lying on the floor "doubled" in pain with numerous bullet holes in his body. He bent down and asked Petty, "What happened?" Petty responded, "Jeff burned me, man. Jeff burned me, man. Get him." Petty also told Hill that he was opening the back door and tried to close it but "it was too late."

Hill then suspected that Jarvis was probably the man to whom Petty had referred when he said that Jeff had burned him; consequently, he and his partner left the apartment to search for him while the other police patrol remained at the scene. One of the officers remaining in the apartment was Officer Keating, who testified that he and his partner were the first to arrive at Petty's apartment. Upon arriving there, Keating saw Petty in the kitchen lying in a pool of blood which had apparently emanated from gunshot wounds. Keating testified that he asked Petty, "What happened, who shot you?" and Petty replied, "Jeff got me, Jeff burned me. Get him." Keating further testified that Petty told him that he heard a knock on the door, opened it, and saw Jarvis there with a gun in his hand. When Petty attempted to shut the door a shot rang out, and as he continued trying to shut the door, bullets kept coming through it, striking him. Keating stayed at the scene and recovered three bullets which lab analysis later indicated were fired from a .45-caliber automatic weapon. Keating did not reduce to writing what Petty had told him.

Meanwhile, Hill and his partner quickly located Jarvis as he was walking down the street. They put him in their squad car and drove him to the apartment, where Tate identified him as the man who had argued with Petty earlier. Jarvis was then taken to Area 1, Violent Crimes office, where he was given *Miranda* warnings and interviewed by Chicago police detective Robert Utter and Assistant State's Attorney Borenstein. Detective Utter testified that Jarvis gave an oral statement admitting that he and Petty were involved in a fight, after which he went to a nearby tavern and drank some beer; that he left the tavern and eventually went to Petty's apartment to purchase some marijuana; that he knocked on the back door and Petty opened it; that at that moment an unknown person reached over his shoulder with a weapon and began firing shots at Petty; that he then fled the scene by the back stairs, and was shortly thereafter apprehended by Officer Hill. Utter further testified that Jarvis averred in his statement that "[I] wouldn't use a .45. If [I] was going to shoot [Petty], [I] would use a nine millimeter, and [I] would kill him." Utter related that no one had ever mentioned to Jarvis that a .45 had been used in the shooting.

At trial, Jarvis testified that he was not angry with Petty after their fight despite the apparent ferocity of the altercation. Jarvis ad-

mitted that he said "I'll be back," but claims that he directed the statement at Petty's neighbor who had watched the fight. He admitted that he returned to Petty's apartment at approximately 3 a.m. to purchase marijuana. According to Jarvis, he partially entered the vestibule and knocked on Petty's door when he suddenly heard a voice behind him say, "Wait a minute." As the door opened, the voice behind him shouted, "[s]tick-up!" Jarvis then saw the reflection of a gun, heard shots being fired, and fled the scene. Jarvis speculated that the unidentified "stick-up" man had been hiding in the vestibule as he entered it.

On cross-examination, Jarvis was asked how the "stick-up" man could have shot over his shoulder if he had been standing beside him, and Jarvis responded: "Because my shoulder is in the inner door. My whole body is not in the door, just one of my arms, around the corner of the door." Jarvis denied running away from the scene with another man when the police stopped him, and also contradicted Officer Hill's testimony that he had said that the "robber" was masked.

■■ ■ We turn now to Jarvis' contention that the trial court committed reversible error by allowing witnesses to testify to Petty's statements as to who had fired the shots. As a general rule, out-of-court statements which are offered to prove the truth of the matter asserted therein are inadmissible as hearsay. (*People v. Hunter* (1984), 124 Ill. App. 3d 516, 528-29, 464 N.E.2d 659.) However, our courts have recognized certain exceptions to the hearsay rule when and if the out-of-court statements possess other characteristics which insure their reliability. In *People v. Damen* (1963), 28 Ill. 2d 464, 193 N.E.2d 25, our supreme court elaborated upon the exception to the hearsay rule for spontaneous declarations:

> " 'A spontaneous exclamation may be defined as a statement or exclamation made immediately after some exciting occasion by a participant or spectator and asserting the circumstances of that occasion as it is observed by him. The admissibility of such exclamation is based on our experience that, under certain external circumstances of physical or mental shock, a stress of nervous excitement may be produced in a spectator which stills the reflective faculties and removes their control, so that the utterance which then occurs is a spontaneous and sincere response to the actual sensations and perceptions already produced by the external shock. Since this utterance is made under the immediate and uncontrolled domination of the senses, rather than reason and reflection, and during the brief period when consideration of self-interest could not have been fully brought to bear, the utterance

may be taken as expressing the real belief of the speaker as to the facts just observed by him.'" (28 Ill. 2d 464, 471, 193 N.E.2d 25; quoting *Keefe v. State* (1937), 50 Ariz. 293, 297, 72 P.2d 425, 427.)

*Damen* proceeded to outline three factors which need to be considered in determining the admissibility of a statement under the spontaneous declaration exception: "(1) an occurrence sufficiently startling to produce a spontaneous and unreflecting statement; (2) absence of time to fabricate; and (3) the statement must relate to the circumstances of the occurrence." *People v. Damen* (1963), 28 Ill. 2d 464, 471, 193 N.E.2d 25, citing *People v. Poland* (1961), 22 Ill. 2d 175, 181, 174 N.E.2d 804.

■ Cases subsequent to *Poland* and *Damen* demonstrate that while these three factors continue to provide guidance, our courts now employ a "totality of the circumstances" approach to determine whether a particular statement is reliable enough to be admissible, indicating that none of the *Damen* elements is singularly determinative. (*People v. Smith* (1984), 127 Ill. App. 3d 622, 627, 464 N.E.2d 634.) Hence, the admissibility of spontaneous declarations should be determined on a case-by-case basis after considering all relevant factual considerations. (*People v. Parisie* (1972), 5 Ill. App. 3d 1009, 1028, 287 N.E.2d 310.) Moreover, "[i]t is not the *time element* [referring to the period between the startling occurrence and the statement] that controls, but the existence or lack of spontaneity in the light of the surrounding circumstances that is determinative." (5 Ill. App. 3d 1009, 1028, 287 N.E.2d 310.) The fact that statements are made in response to queries also does not automatically negate their spontaneity, but is a factor to be considered. (*In re Hatfield* (1979), 72 Ill. App. 3d 249, 257, 390 N.E.2d 453.) The single question "What happened?" to the declarant does not disqualify an utterance that is otherwise voluntary and spontaneous. (*People v. Damen* (1963), 28 Ill. 2d 464, 472, 193 N.E.2d 25; *People v. Webb* (1984), 125 Ill. App. 3d 924, 933, 466 N.E.2d 936.) Furthermore, this court has held that "a gunshot wound is sufficiently startling to produce an unreflective response." *People v. Webb* (1984), 125 Ill. App. 3d 924, 933, 466 N.E.2d 936.

Jarvis contends that "the totality of the circumstances indicate that [Petty's] statements [to Tate and Officers Hill and Keating] were neither spontaneous nor reliable," and that "the admission of the statements violated Jarvis' right to confrontation because there was no showing or testing the reliability of the information contained in the statements." Jarvis further argues that the response to Tate's question should be inadmissible since it was prompted by the suggestiveness of

the question, i.e., "Was it the same dude who you argued with earlier?" Jarvis also proposes that the statements made to Officer Keating should be barred because their explanatory, detailed nature illustrate that Petty's reflective faculties were functioning and his identification was "more like a recital of events elicited from questions propounded to him" than a spontaneous utterance. (*People v. Witte* (1983), 115 Ill. App. 3d 20, 28, 449 N.E.2d 966.) Finally, Jarvis maintains that Petty's statements to Hill were inadmissible because they were too far removed in time from the startling occurrence, and also that they were tainted by Petty's earlier inadmissible responses to Tate and Keating.

■ We first reject the defendant's argument that Petty's statements to Tate should be barred because her question suggested an answer. This court addressed an analogous situation in *People v. Watts* (1985), 139 Ill. App. 3d 837, 487 N.E.2d 1077. In *Watts*, a 16-year-old complainant, after being raped, went home crying to her mother, and before the complainant said anything, the mother asked her if she had been raped. In response the girl stated that the defendant had indeed raped her. The court rejected the defendant's argument that the statement was uttered only in response to the mother's questions. Instead, the court held that "[t]he key inquiry in deciding whether such a statement should be admitted is whether the statement would have been made if the questions had not been asked." (139 Ill. App. 3d 837, 850, 487 N.E.2d 1077.) Applying this standard, the court found that "[i]n view of complainant's physical and emotional condition and the fact that she immediately sought out her mother and started crying, it is clear that complainant would have told her mother about the rape at the moment even without being asked." (139 Ill. App. 3d 837, 840, 487 N.E.2d 1077.) In the case at bar, it is likewise clear under the circumstances that Petty would have told Tate who had shot him without his being asked.

■ We also reject the defense argument that Petty's declarations to Keating should be inadmissible because they were more on the order of a reflective recital of events in response to queries than a spontaneous declaration. The court in *People v. Parisie* (1972), 5 Ill. App. 3d 1009, 287 N.E.2d 310, considered a similar set of facts. There, although the decedent was found lying alongside the road covered with blood, he nevertheless was able to tell a State trooper in response to questioning that he was shot by an unidentified man who proceeded to steal his car. That same day, the defendant, Parisie, was found in possession of the decedent's car with the latter's driver's license and credit cards in his own wallet. The court found that the physical state of the decedent demonstrated that neither *the opportunity nor the*

probability of fabrication was available, and that the question and answer method utilized by the trooper did not destroy the spontaneity of the victim's remarks. It is clear, then, that the victim's mere giving of a detailed description of the offense, even if given as answers to questions, does not destroy the spontaneity of the statements as long as the circumstances indicate that the declarant was still under the shock of the event. Similarly, in this instance Petty's giving a relatively detailed account of what happened at his apartment in response to neutral questions from Officer Keating does not destroy the spontaneity of his statements when one considers the condition in which Tate and the police officers found him, a condition which can be described only as *in extremis*, and one which certainly must have inhibited his capacity to reflect on what had transpired and to manufacture an untrue version of events.

■ As to whether Petty's statements to Officer Hill were admissible, it is clear to this court that such declarations, made approximately 15 minutes after the shooting, were not so far removed from the startling occurrence as to bring into question their reliability. In *People v. Robertson* (1976), 43 Ill. App. 3d 143, 356 N.E.2d 1180, this court considered the admissibility of several statements by a victim after she was stabbed several times, some of which declarations were made 5 to 18 minutes after the attack, and others of which were made 30 to 45 minutes later in an ambulance. The court, after recognizing that the time passed and the distance traveled are factors which should be considered in determining whether the statements were spontaneous (43 Ill. App. 3d 143, 147, 356 N.E.2d 1180), ruled that all of them were admissible, finding that:

> "it is clear from the evidence that [the victim] was not in a condition to manufacture and narrate an untrue version of the attack. She had received no medical treatment other than a few bandages. Her physical condition was deteriorating, and some of [the] statements were not responsive to the questions asked. Furthermore, unlike cases where the victim has been removed to the hospital and makes a statement several hours after the crime [citations], the distance here in terms of time and place were [*sic*] so minimal, under the circumstances, that the victim lacked sufficient opportunity for reflection and invention. These declarations obviously sprang from the shock of the event and not from conscious deliberation or calculation. Considering the gravity of her wounds, the violence of the attack, and the frightening ordeal she had just endured, we conclude that it was properly within the discretion of the trial court to admit the victim's

statements [to the ambulance attendant.]" (43 Ill. App. 3d 143, 148, 356 N.E.2d 1180.) The holding in *Robertson* applies with even greater force and validity here, considering that the time difference between the shock of the event and Petty's statements was shorter and Petty's physical condition must have been at least as grave as the victim's in *Robertson*. Therefore, we hold that Petty's statements were properly admitted under the spontaneous declaration exception to the hearsay rule.

■■ ■ Turning now to whether the State proved Jarvis guilty beyond a reasonable doubt, we note initially that it is the jury's function to assess the credibility of witnesses, to determine the weight to be credited to such evidence, and to evaluate the inferences to be drawn from it. (*People v. Bradford* (1985), 106 Ill. 2d 492, 502, 478 N.E.2d 1341.) A jury verdict should not be disturbed unless the evidence, viewed in the light most favorable to the prosecution, is so improbable, unsatisfactory, or inconclusive that no rational trier of fact could have found defendant guilty beyond a reasonable doubt. *People v. Hunter* (1984), 124 Ill. App. 3d 516, 525; *People v. Collins* (1985), 106 Ill. 2d 237, 261, 478 N.E.2d 267, *cert. denied* (1985), 474 U.S. 935, 88 L. Ed. 2d 274, 106 S. Ct. 267.

The defense contends that because Jarvis' conviction was based almost entirely upon what it characterizes as unreliable and untested hearsay statements, the State failed to prove Jarvis' guilt beyond a reasonable doubt. It claims that the proof offered by the State was insufficient "particularly when it is compared to Jarvis' own reasonable, consistent version of the events." Jarvis emphasizes that the incident took place in the dark and that there was no way of knowing how good a view Petty had of his assailant. Jarvis further asserts that Petty's statements that Jarvis fired the gun are belied by the evidence that no gun was recovered. As mentioned earlier, Jarvis proposes to us that he was an innocent bystander-witness to a murder in which he had no involvement, and he relies on the well-established principle of law that mere presence at the scene of an offense does not, in and of itself, establish guilt.

The State, however, advances convincing arguments that Jarvis was indeed proved guilty beyond a reasonable doubt, emphasizing that Jarvis had a motive to kill Petty after losing the fight, made an implied threat to do so, and admitted returning to Petty's apartment only a few hours after the altercation. Jarvis was also present when Petty was gunned down, and he was apprehended while fleeing the scene of the crime with another man. Furthermore, during police questioning, Jarvis indicated that he knew more than he was telling about the

shooting when he stated to Detective Utter that he wouldn't use a .45-caliber weapon in that situation, although no one had mentioned to him that a .45 was in fact used. The State also points out that the fact that the murder weapon was not recovered does not *ipso facto* obscure Jarvis' guilt in light of the other weighty and compelling evidence of his guilt. According to the State, the jury could reasonably have determined that Jarvis gave the gun to the man with whom he was seen running or that he disposed of it in such a way that it would not be likely to be found.

The arguments of the State have special resonance when we consider that, according to Jarvis, he returned to Petty's apartment to buy marijuana a short time after being physically beaten by Petty and apparently cheated by him in a similar drug deal earlier that evening. We are to consider further that when he arrived there, some unknown person for some unknown reason was hiding in the vestibule adjacent to the victim's apartment at 3 a.m., and that only after Jarvis arrived and knocked on Petty's door did the unknown person come out of hiding, yell "Stick up!" and fire six shots through Petty's door for some reason that must forever remain arcane. We must consider additionally that Jarvis offers no plausible explanation as to why he was standing in such an awkward position with one foot inside the door.

■ ■ The law is clear that "[w]hen a defendant elects to justify or explain his presence at or near the scene of a crime, while denying participation, he must tell a reasonable story or be judged by its improbabilities." (*People v. Lobb* (1959), 17 Ill. 2d 287, 294, 161 N.E.2d 325.) Accordingly, we can, without any tedious cerebration, agree with the State that Jarvis' dismally unconvincing testimony was nothing more than a futile effort on his part to weave a totally implausible explanation around a host of relentlessly incriminating facts which he could not in any way alter. Given these circumstances, it is all too readily and easily apparent that the jury's verdict of guilty was in no wise so irrational, unreasonable, or improbable as to call into question Jarvis' guilt.

■ Jarvis next contends that the trial court committed reversible error in allowing Officer Keating to testify with respect to Petty's hearsay statements despite the fact that defense counsel was not informed of these statements, and that such failure to disclose surprised defense counsel and prevented her from effectively cross-examining Keating. Illinois Supreme Court Rule 412(a)(i) requires that, in a criminal case, the State disclose to the accused a list of the persons the State intends to call as witnesses, any written or recorded statements of those witnesses, substantially verbatim reports of witnesses' oral

statements, and a list of memoranda reporting or summarizing witnesses' oral statements. (87 Ill. 2d R. 412; *People v. Witherspoon* (1979), 69 Ill. App. 3d 391, 397, 388 N.E.2d 1.) However, the rules do not require the State to reduce all oral statements to writing, and a witness will not be disqualified from testifying simply because the State in good faith did not draft memoranda of a witness' pretrial oral statements. *People v. Abbott* (1977), 55 Ill. App. 3d 21, 24, 370 N.E.2d 286.

The State contends that at all times it acted in good faith and was not aware that Keating would testify concerning Petty's statement until the morning of trial, when Keating disclosed his personal knowledge of such statements to the assistant State's Attorney who prosecuted the case. Under similar circumstances, this court has held that the State does not have a duty to disclose such oral statements. (*People v. Caldwell* (1976), 39 Ill. App. 3d 1, 349 N.E.2d 462.) In *Caldwell*, the defendant argued that the State failed to comply with its continuing duty to disclose by not informing the defendant about a conversation which took place between the assistant State's Attorney and a State's witness on the second day of *voir dire*. As in the case *sub judice*, the witness' statement was not reduced to writing and tendered to the defense. The court found that where the conversation did not take place until the second day of *voir dire*, there was "no bad faith in the prosecutor's failure to reduce the statement to written form." (39 Ill. App. 3d 1, 5, 349 N.E.2d 462.) Therefore, the court held that since there was no showing of bad faith with respect to the State's Attorney's omitting to make a written memorandum of the witness' statement, there was "no prejudicial error in the State's failure to disclose this information to defendant." 39 Ill. App. 3d 1, 6, 349 N.E.2d 462.

As mentioned, Keating testified that he did not make any written notes or reports with respect to what Petty had told him on the evening of the shooting. The defendant makes no showing that the prosecutor acted in bad faith by failing to make a written memorandum of Keating's statements. Thus, as in *Caldwell*, in the absence of bad faith we discern no prejudicial error. Moreover, the cases cited by the defense are inapplicable, since they treat with the State's failure to disclose oral statements made by the accused under Rule 412(a)(ii), and not witness' statements. *People v. Winfield* (1983), 113 Ill. App. 3d 818, 447 N.E.2d 1029; *People v. Bailey* (1982), 103 Ill. App. 3d 503, 431 N.E.2d 723.

Jarvis' next contention is that the trial court committed reversible error by refusing to submit a voluntary manslaughter instruction to the jury. The law is well settled that a defendant is entitled to such an instruction "if there is any evidence in the record which, if be-

lieved by the jury, would reduce the crime to manslaughter." (*People v. Lewis* (1977), 51 Ill. App. 3d 109, 116-17, 366 N.E.2d 446.) The statutory definition of voluntary manslaughter is set forth in section 9—2(a) of the Criminal Code of 1961:

> "Sec. 9—2. Voluntary Manslaughter.
>
> (a) A person who kills an individual without lawful justification commits voluntary manslaughter if at the time of the killing he is acting under a sudden and intense passion resulting from serious provocation by:
>
> (1) The individual killed ***
> ***
>
> Serious provocation is conduct sufficient to excite an intense passion in a reasonable person." (Ill. Rev. Stat. 1985, ch. 38, par. 9—2(a).)

Jarvis asserts that a voluntary manslaughter instruction was essential since it "was not only consistent with the State's theory that Jarvis returned to the apartment very angry and shot Petty, but also with the testimony of all the witnesses including Jarvis himself who indicated there had been a fight between Jarvis and Petty before the shooting."

The defense cites two cases in support of its argument that a voluntary manslaughter instruction was necessary. In *People v. Harris* (1956), 8 Ill. 2d 431, 134 N.E.2d 315, the victim beat and forcibly evicted the defendant from a bar. The defendant then walked down the street and 15 minutes after the assault returned to the bar and shot the victim. In considering whether a voluntary manslaughter instruction was appropriate, the court focused its attention upon the question of whether a sufficient "cooling off" period had passed between the argument and the shooting:

> "What constitutes a sufficient 'cooling-off period' depends upon the extent to which the passions have been aroused and the nature of the act which caused the provocation *** and, for that reason, no yardstick of time can be used by the court to measure a reasonable period of passion but it must vary as do the facts of every case. Humans react violently to the infliction of a serious injury, and the degree of pain which results therefrom not only governs the passion itself but also influences the duration of the cooling period." (8 Ill. 2d 431, 435, 134 N.E.2d 315.)

The court concluded that in view of the severity of the attack and the short lapse of time between the injury and the shooting, the trial court did not err in giving the manslaughter instruction.

The defense also cites the case of *People v. Thomas* (1978), 58 Ill. App. 3d 402, 374 N.E.2d 743, in which, according to Jarvis, the

defendant was entitled to a voluntary manslaughter instruction, even though he was physically beaten an entire evening before the shooting. The defense concludes that the similar results reached in *Harris* and *Thomas*, despite their factual differences with respect to the elapsed time between the provocation and the killing, suggest that the court here improperly removed this question from the jury and that the time which passed between the fight and the shooting herein did not preclude a finding that this was manslaughter. Finally, the defense asserts that simply because Jarvis testified that he was not angry when he returned to Petty's apartment does not mean that a voluntary manslaughter verdict is unwarranted, since a defendant is entitled to such an instruction even if he presents a defense theory at trial which is inconsistent with the possibility that the defendant is guilty of manslaughter. *People v. Lewis* (1977), 51 Ill. App. 3d 109, 117, 366 N.E.2d 446.

We believe, however, that *Harris* and *Thomas* are readily distinguishable. As to *Harris*, the cooling-off period was considerably shorter than in this case, and the injuries inflicted on Petty were more severe. Hence, it seems clear that under the circumstances of that case, the manslaughter instruction was justified. We also find that the defense completely misreads the *Thomas* case, which simply does not, Jarvis contends, stand for the proposition that a voluntary manslaughter instruction is proper when the alleged provocation occurred an entire evening before the killing. Jarivs apparently overlooks the following passage from *Thomas*:

> "Here, there was sufficient evidence from which the jury could have concluded that the defendant's actions were the result of sudden and intense passion. *** The defendant had been beaten twice within a period of 18 hours. He had been told to keep out of the neighborhood by Dandridge, and immediately before the shooting he had been held to the ground by Dandridge while being searched. Within seconds of this tussle, the defendant shot the deceased." (*People v. Thomas* (1978), 58 Ill. App. 3d 402, 406, 374 N.E.2d 743.)

The court concluded that the manslaughter instruction was proper since there was hardly any time for the defendant therein to "cool off."

Here, in contrast, we have a cooling-off period of approximately 3½ hours. The State points out that although mutual combat is sufficient to support a finding of provocation, such combat does not justify giving the instruction sought herein where "sufficient time had lapsed between the alleged provocation and the homicide to permit the

voice of reason to be heard." *(People v. Coleman* (1984), 124 Ill. App. 3d 285, 289, 464 N.E.2d 706.) Moreover, in considering whether to reduce a murder conviction to voluntary manslaughter, this court has held that "[a]lthough only seconds may have passed between the end of the fight and the shootings, *** there was a sufficient pause to permit passions to cool and the voice of reason to be heard." *(People v. Akins* (1976), 39 Ill. App. 3d 908, 913, 351 N.E.2d 366.) In *Coleman,* the defendant testified that he and the victim had a fight over a debt, and after the fight defendant Coleman went home and returned 40 minutes later with a gun and shot the victim. Coleman testified that he was not angry when he shot the victim. In response to Coleman's argument that he was entitled to a voluntary manslaughter instruction, the court found that the record was devoid of any evidence from which the jury could reasonably have found him guilty of manslaughter. The court noted that the 40 minutes was a sufficient cooling-off period, and went on to state:

"Moreover, when the trial court asked defendant if he was still angry after the fight, but before the time he shot the victim, he replied 'No sir. I wasn't.' Clearly, defendant's admission indicates that he was not acting under the influence of a sudden and intense passion when he shot the victim." *(People v. Coleman* (1984), 124 Ill. App. 3d 285, 290, 464 N.E.2d 706.)

The circumstances herein militate much more strongly against the giving of a voluntary manslaughter instruction since Jarvis had a considerably longer period to cool off than Coleman. Additionally, as did Coleman, Jarvis testified that he was not angry when he returned to Petty's apartment. Accordingly, we hold that the trial court was correct in refusing to submit a voluntary manslaughter instruction to the jury.

Finally, we consider Jarvis' contention that the trial court committed reversible error by submitting an accountability instruction to the jury, but refusing to tender an instruction to the effect that mere presence at the scene of a crime is insufficient evidence of guilt. First, regarding whether it was error to give an accountability instruction, the rule is well settled that even slight evidence upon a theory of accountability will justify the giving of such an instruction even where a defendant is tried alone. *(People v. Daniels* (1985), 139 Ill. App. 3d 475, 479, 487 N.E.2d 947.) Jarvis maintains that there is no evidence to support the submission of an accountability instruction (Illinois Pattern Jury Instructions, Criminal, No. 5.03 (2d ed. 1981) (IPI Criminal 2d)), and argues that there was nothing to indicate that he was in any way connected with the other individual seen running from the area.

Jarvis emphasizes that there was no testimony that he solicited anyone's aid to commit the crime, or for that matter that he even spoke to anyone at the bar where he drank for several hours before returning to Petty's apartment.

In contrast, the State contends that there was at least some evidence from which the jury could have reasonably concluded that another participant might have been involved in the shooting. Jarvis admitted that an unknown assailant fired the shots that killed Petty. Since the murder weapon was never recovered, the jury could logically infer that another individual actually fired the shots that slew Petty, or that he at least carried the gun away. As mentioned earlier, Officer Hill testified that he observed a man fleeing the scene "side by side" with Jarvis. The fact that Jarvis stated to Detective Utter that if he had done the killing, he would not have used a .45 strongly indicates that Jarvis was at least privy to information as to who shot Petty, and that he perhaps was directly involved in the planning and commission of the act. Moreover, Jarvis never offered a credible explanation for his presence at the scene. Accordingly, we hold that there was sufficient evidence from which the jury could reasonably infer that another man was involved in the shooting, and that therefore the trial court did not err when it gave the accountability instruction.

■ With respect to Jarvis' contention that it was error for the trial court to refuse to submit to the jury his instruction that mere presence at the scene of the crime is insufficient to prove the defendant's guilt beyond a reasonable doubt, the law is clear that a party is entitled to appropriate instructions which present that party's theories of the case to the jury only when there is evidence in the case to support such theories. (*People v. Miller* (1980), 90 Ill. App. 3d 422, 427, 413 N.E.2d 143.) This court dealt with a similar issue in *People v. Walker* (1976), 44 Ill. App. 3d 494, 358 N.E.2d 672, wherein the defendant also claimed that it was error for the judge to refuse to give a "mere presence" instruction. The court stated that "the refusal of a tendered instruction is not error if the essence of the instruction is covered by other instructions which are given." (44 Ill. App. 3d 494, 498, 358 N.E.2d 672.) The *Walker* court went on to find that by giving the jury IPI instruction 2.03 (IPI Criminal 2d No. 2.03) (*i.e.*, defendant is presumed innocent, the State has the burden of proving guilt beyond a reasonable doubt) as well as IPI instruction 5.03 (IPI Criminal 2d No. 5.03) (accountability), the court gave instructions which "encompass the theory of defense presented in this case, and it was not error for the trial court to refuse to give the instruction tendered by the defendant." (44 Ill. App. 3d 494, 498, 358 N.E.2d 672.) Here, the trial court also gave IPI instructions 2.03 and

432

5.03 (IPI Criminal 2d Nos. 2.03, 5.03), covering presumption of innocence and accountability, respectively, which we believe adequately apprised the jury of the applicable law. Therefore, we find no error in the trial court's refusal to give the defendant's "mere presence" instruction.

Accordingly, the decision of the trial court is affirmed.

Affirmed.

STAMOS and BILANDIC, JJ., concur.