THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.*
ARTHUR W. THOMAS, Defendant-Appellant.

First District (3rd Division)    No. 76-1443

Opinion filed March 6, 1978.

James J. Doherty, Public Defender, of Chicago (Ira Churgin, Assistant Public Defender, of counsel), for appellant.

Bernard Carey, State's Attorney, of Chicago (Laurence J. Bolon, Joan S. Cherry, and Thomas X. Smith, Assistant State's Attorneys, of counsel), for the People.

Mr. JUSTICE SIMON delivered the opinion of the court:

The defendant was indicted for the murder of Donald Dandridge. The jury returned a voluntary manslaughter verdict, and the defendant was sentenced to a term of 3 to 10 years. The only witness present when Dandridge was shot, other than the defendant, was John Tayborn, who testified for the State.

Tayborn was the victim's best friend and had seen him almost every day for 4 years. He was with Dandridge from noon until 4:40 p.m. the day Dandridge was killed and testified that during the time they were together Dandridge did not have anything to drink and did not have any difficulty walking. Tayborn did not remember any odor of alcohol on Dandridge's person when they met at noon the day of the killing. It was stipulated that a toxicologist from the coroner's office, if called as a witness, would testify that 99.0 milligrams percent ethanol was found in Dandridge's blood, which is one point less than the legal presumption for driving while under the influence of alcohol.

Tayborn testified that he and Dandridge met the defendant and Vance Barnes, a companion of the defendant, at the site of the occurrence on the west side of Chicago on the afternoon of January 12, 1974. Dandridge told the defendant, who lived on the south side of the city, that he did not want the defendant in the neighborhood any longer. The defendant then slapped Dandridge's face. Dandridge removed his coat, handed it to Tayborn, hit defendant a few times and knocked him to the ground. Dandridge pinned the defendant on the ground for about 30 seconds, hitting him four or five times while he was on the ground. After frisking the defendant around the waist, Dandridge permitted him to stand up. As Dandridge faced the defendant with nothing in his hands, the defendant backed away, drew a gun and fired several shots at Dandridge in quick succession.

Tayborn testified he fled to the vestibule of a nearby building to attempt to obtain assistance in calling the police, but was informed the police were already at the scene. When Tayborn returned to the scene a few minutes later, the defendant was not present.

Tayborn testified on cross-examination that about a week before his death, Dandridge, in the defendant's presence, showed Tayborn a handgun he was carrying. Tayborn also testified that the night before his death, Dandridge and the defendant argued near the place where the shooting occurred, and Dandridge told the defendant to stay out of the neighborhood. On this occasion Dandridge struck the defendant five or six times, and Tayborn did not remember whether the defendant hit Dandridge. Tayborn also testified that Dandridge did not pick up anything during the fight when he was killed and that he was not moving toward the defendant when the latter rose from the ground.

The defendant testified that because he had been struck in the head while on the west side of Chicago about 6 months before Dandridge's death, he commenced carrying a gun. He stated that one of his brothers was killed on the west side, and that another brother was shot twice near where Dandridge was killed. About a week before Dandridge was killed, Dandridge pointed two guns at the defendant, and put them away when the defendant told him to get them out of his face. The night before the shooting Dandridge hit him a couple of times, but the defendant did not strike him back.

The defendant further testified that the next afternoon, when he encountered Dandridge and Tayborn, Dandridge told the defendant he thought he had told the defendant that he was barred from the neighborhood. When the defendant asked him what he meant, Dandridge hit him twice, grabbed him, threw him to the ground and hit the defendant seven or eight times while he was on the ground. Dandridge then frisked the defendant while he was on the ground and told the defendant that if he found something, he was going to kill him. The defendant did not hit Dandridge back. While he had the defendant on the ground Dandridge had his coat on. Dandridge then let the defendant get up, and the defendant turned and started walking away. When he had walked several feet from the place of his encounter with Dandridge, the defendant heard Dandridge say, "I'm going to kill this M.F." He turned around and saw Dandridge running toward him with a pipe 15 to 18 inches long in his hand. Dandridge was 8 to 10 feet from the defendant and coming closer when the defendant drew his gun and fired it at Dandridge until it was empty.

The defendant testified that he ran from the scene, dropping his gun in a vacant lot. He returned to his home on the south side, where, later the same day, he flagged down a police car and surrendered. The defendant stated that the incident happened very quickly and all he could think about was saving himself. Conceding that he did not tell the officers to whom he surrendered that Dandridge was carrying a pipe at the time of the shooting, the defendant explained they did not ask him that question. He claimed he did tell the investigating assistant State's Attorney who interviewed him after his arrest that Dandridge had a pipe in his hand when he shot Dandridge. The assistant State's Attorney testified that, when asked, the defendant stated that the man he shot was not armed. According to the assistant State's Attorney, the defendant told him that Dandridge was coming at the defendant and threatening him, but never mentioned the word "pipe" in the interview.

Prior to Tayborn's testimony and outside the jury's presence, the defense requested that it be permitted to impeach Tayborn on the basis of a 2-year-old conviction for misdemeanor theft. Defense counsel argued

that the conviction involved moral turpitude, and that it was therefore admissible for impeachment purposes under *People v. Montgomery* (1971), 47 Ill. 2d 510, 268 N.E.2d 695. The trial court ruled that Illinois law did not extend to impeachment by misdemeanor theft and denied the defendant's request. Also, during the conference on instructions the defendant objected to instructions given by the court covering voluntary manslaughter on the ground that the record contained no evidence to support such instructions.

The trial court erred in not allowing the defendant to impeach Tayborn with his conviction for a misdemeanor theft 2 years prior to his testimony. *People v. Clay* (1977), 45 Ill. App. 3d 145, 147-148, 359 N.E.2d 482; *People v. Ray* (1976), 36 Ill. App. 3d 283, 285-286, 343 N.E.2d 560; and *People v. Barnett* (1975), 34 Ill. App. 3d 174, 179-180, 340 N.E.2d 116, hold that misdemeanor convictions may be used for impeachment purposes if the other *Montgomery* requirements are met. Such a conviction is available to impeach not only a defendant who testifies in his own defense, but a State witness as well. In fact, as pointed out in *People v. Jacobs* (1977), 51 Ill. App. 3d 455, 460, 366 N.E.2d 1064, there is less possibility of unfair prejudice when a prior conviction is used to impeach a witness than when it is used to impeach a defendant, because a defendant who has committed a previous crime may be convicted because of his prior offense, rather than because of the lack of credibility in his defense.

The State argues that even if the trial court erred in not permitting Tayborn's impeachment, the error was harmless because the testimony of Tayborn and the defendant differed only in small details and because a witness and a police officer who arrived at the scene of the shooting shortly after the occurrence found no pipe in the vicinity.

■■ This argument is fallacious. During closing argument the State repeatedly pitted Tayborn's credibility against that of the defendant, arguing that Tayborn should be believed because he had no reason to lie while the defendant had a motive to lie in order to be acquitted. The assistant State's Attorney told the jury in final closing argument, "It boils down to the credibility of the defendant versus the credibility of John Tayborn." Tayborn was the State's only eyewitness and on crucial facts— principally, whether Dandridge was moving to attack the defendant with a pipe immediately prior to the shooting, how severe the beating was just before the shooting, and who the initial aggressor was—Tayborn's testimony was diametrically opposed to the defendant's. That a pipe was not found at the scene of the shooting, while supportive of Tayborn's testimony, does not insulate that testimony from the need for close scrutiny. Further, the testimony of the police officer and the assistant State's Attorney, that the defendant failed to mention a pipe, does not establish that Tayborn's testimony was accurate. Moreover, Tayborn's

credibility was called into question by the inconsistency between his testimony relating to Dandridge's use of liquor on the day of the shooting and the stipulated testimony of the toxicologist. Tayborn's testimony was crucial on the defendant's contention that he acted in self-defense, and the error in keeping from the jury relevant facts bearing on Tayborn's trustworthiness prejudiced the defendant. For this reason, the defendant is entitled to a new trial.

The defendant argues that his conviction should be reversed outright, and not remanded, because the jury was improperly instructed on the theory of voluntary manslaughter. The defendant's contention is that in finding him guilty only of the lesser offense of voluntary manslaughter, the jury acquitted him of the offense of murder for which he was indicted. Thus, if the jury was improperly instructed on the lesser offense, the defendant maintains he should not be tried again. (*People v. Newman* (1935), 360 Ill. 226, 231-32, 195 N.E. 645.) This argument, then, requires us to determine whether there was any justification for the instructions the circuit court gave on the two types of voluntary manslaughter, one in which an accused's actions are caused by a sudden and intense passion and the other in which an accused unreasonably believes he is about to be killed or suffer great bodily harm.

■■ Here, there was sufficient evidence from which the jury could have concluded that the defendant's actions were the result of sudden and intense passion. Thus, the voluntary manslaughter instruction asking the jury to decide whether this was why the defendant shot Dandridge was proper. The defendant had been beaten twice within a period of 18 hours. He had been told to keep out of the neighborhood by Dandridge, and immediately before the shooting he had been held to the ground by Dandridge while being searched. Within seconds of this tussle, the defendant shot the deceased. This action may well have been caused by the defendant's state of mind; a mutual quarrel or combat may result in sufficient provocation to permit a finding of voluntary manslaughter. *People v. Pierce* (1972), 52 Ill. 2d 7, 11, 284 N.E.2d 279.

Tayborn's testimony that the defendant slapped Dandridge prior to the shooting did not make the defendant the aggressor, a theory which he now advances to support his argument that the law does not permit one who initiates a combat to rely on the dispute to mitigate his offense from murder to manslaughter caused by intense or irresistible passion resulting from serious provocation. First, the defendant's testimony raises substantial doubt as to whether he slapped or struck Dandridge on the day of the shooting. Next, the evidence indicates Dandridge was the aggressor in his encounter with the defendant the evening before the shooting. Although the defendant had time to cool off before his next encounter with Dandridge, when they met the next day and Dandridge

threatened the defendant by telling him he was barred from the neighborhood, this comment, coupled with the beating he received the previous evening, would have been sufficient provocation to make Dandridge, rather than the defendant, the aggressor.

In addition, if the defendant is tried again, the propriety of a second voluntary manslaughter instruction, this one regarding the reasonableness of the defendant's belief that Dandridge was going to kill him or do him great bodily harm, may again arise. For that reason we believe this issue should be addressed here.

■■ This second type of voluntary manslaughter instruction was not supported by sufficient evidence and should not have been given. Tayborn testified that Dandridge did not come at the defendant after he let him up from the ground and that Dandridge had nothing in his hands. The defendant, though, testified that he heard Dandridge say, "I'm going to kill this M.F.," and that when he turned around he saw Dandridge advancing toward him with a 15 to 18 inch pipe in his hand. Whether Tayborn's testimony or that of the defendant is believed, no issue is raised as to the reasonableness of the defendant's belief that it was necessary for him to act in self-defense. If Tayborn's testimony is an accurate account of what took place, Dandridge controlled the situation and was not approaching or menacing the defendant after he terminated the encounter by releasing the defendant. Dandridge was unarmed, and at this point, the defendant, who was armed, was free to leave and could not have felt threatened by the unarmed person who had released him and was not pursuing him. Thus, Tayborn's testimony does not justify an instruction that the jury could find the defendant guilty of voluntary manslaughter if he believed that circumstances existed which justified killing Dandridge, but his belief was unreasonable.

On the other hand, the defendant's testimony, if accepted by the jury, did not leave any doubt about the reasonableness of his belief, since the defendant asserted he was acting in self-defense. In this case, the instruction on reasonable belief with respect to self-defense was requested by the State, not by the defendant. The defendant had a right to have the jury choose between his version of the shooting and Tayborn's. The submission of the instruction regarding the reasonableness of the defendant's belief that Dandridge was going to kill or do serious harm to the defendant relieved the jurors of the need to make this decision and presented them with an easier, compromise alternative.

■■ The State brings forth two cases on this issue. However, *People v. Johnson* (1971), 1 Ill. App. 3d 433, 274 N.E.2d 168, is not helpful here because the refused instruction in that case was requested by the defendant, rather than objected to by the defendant, as in this case. Nor is

*People v. Young* (1973), 11 Ill. App. 3d 609, 297 N.E.2d 298, relevant, because that decision, which reviewed a bench trial, did not involve the propriety of jury instructions regarding reasonable belief as to self-defense. See *People v. Lewellen* (1969), 43 Ill. 2d 74, 250 N.E.2d 651; *People v. Jordan* (1954), 4 Ill. 2d 155, 122 N.E.2d 209.

Finally, the trial court did not err in instructing the jury with regard to admissions. That relevant instruction, IPI Criminal No. 3.06, was supported by the testimony of the assistant State's Attorney that the defendant told him that Dandridge was not armed at the time of the shooting. Conversely, the defendant testified he told the assistant State's Attorney that Dandridge had a pipe.

For the reasons set forth above, the judgment is reversed and this case is remanded for a new trial.

*Judgment reversed and remanded.*

McNAMARA and McGILLICUDDY, JJ., concur.