NURYMAR TORRES, Plaintiff-Appellant, v. IRVING PRESS, INC.,
Defendant-Appellee.

First District (6th Division)   No. 1—96—0657

Opinion filed January 29, 1999.

Donald J. Nolan, of Chicago, for appellant.

O'Connor, Schiff & Myers, of Chicago, for appellee.

JUSTICE BUCKLEY delivered the opinion of the court:

This case is an appeal from a jury verdict in favor of plaintiff Nurymar Torres and against defendant The Irving Press, Inc. Plaintiff and her father, Miguel Torres, were injured as a result of a collision between plaintiff's vehicle and a vehicle owned by defendant and driven by Kurt Blumenthal. The jury awarded plaintiff $300,000 for past and future pain and suffering, $100,000 for past and future medical expenses, $5,000 for past and future lost wages and $0 for loss of normal life. The verdict was reduced by the jury's finding that plaintiff was 50% negligent and plaintiff was awarded $202,500. The jury awarded Miguel Torres $554,000 and he does not appeal any part of the trial court's order. Plaintiff appeals and raises the following issues: (1) whether the jury's award of $0 for loss of normal life was proper; (2) whether the trial court erred in barring admission of a witness' four-year-old misdemeanor theft conviction; (3) whether the jury's award of $5,000 for past and future lost wages was proper; (4) whether the trial court erred in requiring the jury to assess the percentage of fault between plaintiff and defendant for purposes of section 2—1117 of the Code of Civil Procedure (735 ILCS 5/2—1117 (West 1992)); and (5) whether the trial court erred in refusing to give Illinois Pattern Jury Instructions, Civil, No. 5.01 (3d ed. 1995) when defendant withdrew its medical evaluating expert. Issues (1) and (2) will be considered in this opinion; issues (3) through (5) will be determined in a separate order pursuant to Supreme Court Rule 23 (166 Ill. 2d R. 23) disseminated contemporaneously with this opinion. For the reasons that follow, and those contained in our separate Rule 23 order, we affirm in part, reverse in part, and remand for a new trial.

STATEMENT OF FACTS

On November 19, 1992, at approximately 9:20 a.m., plaintiff was driving her Ford Escort northbound on Halsted approaching the intersection of Halsted and Division Streets. Her father, Miguel Torres, was in the front passenger seat. Plaintiff was on her way to work as a

news editor for WSNS TV. Plaintiff testified that, as she approached the intersection, the light was green.

At the same time, Kurt Blumenthal was driving southbound on Halsted approaching the intersection of Halsted and Division Streets. Blumenthal was in the scope of his employment for defendant and driving defendant's Lincoln. Blumenthal testified that, as he approached the intersection, the light was green. He testified that he stopped in the intersection to wait for the oncoming northbound traffic to clear. He stated that he first saw plaintiff's vehicle when it was about 100 feet away from the intersection and that the vehicle was traveling about 25 to 30 miles per hour. Blumenthal testified that when the traffic light for northbound/southbound traffic on Halsted turned red and the traffic light for eastbound/westbound traffic on Division turned green he began to move. The next time he saw plaintiff's car was on impact. The right-front side of defendant's car was damaged and the front of plaintiff's car was damaged.

Prior to the collision, Jose Vasquez had been traveling southbound on Halsted behind Blumenthal's Lincoln for about two blocks. Vasquez testified that he observed the Lincoln move from left to right about two times. He stated that the Lincoln was traveling about 30 miles per hour. He stated that he never saw the Lincoln's left-turn signal activated. He also testified that the Lincoln never stopped or slowed down before making the left turn onto Division. Vasquez testified that the color of the traffic light before the collision, at the time of the collision, and immediately after the collision was green. Vasquez testified that, after he saw the collision, he made a left turn onto Division around the cars and the light was still green.

At the time of the accident, Michael Williams, a defense witness, was an employee of Phillip's Towing, which is located at the intersection of Halsted and Division. Prior to Williams' testimony, plaintiff presented a certified copy of Williams' prior misdemeanor theft conviction. Plaintiff sought to introduce the conviction and intended to impeach Williams on the stand. The trial court conducted a *voir dire* examination of Williams to investigate the nature and circumstances of the conviction. Thereafter, the trial court barred admission of the conviction. Williams testified that, at the time of the accident, he was standing in the yard of Phillip's Towing speaking with another employee, Chester Morris. However, Chester Morris testified he was inside the office when he heard a crash and did not see anything. Nevertheless, Williams testified that he saw plaintiff's Escort traveling north on Halsted approaching the intersection at about 35 to 40 miles per hour. Williams testified that he saw the light go from green to yellow to red. He testified that the light changed to red and the Escort

entered the intersection and he heard a loud crash. On cross-examination, Williams testified that he did not see the crash, he heard it. He also stated that his estimate of the Escort's speed was based upon what he heard. In addition, Williams stated that he towed defendant's car. After towing the car, he left the scene and never spoke with a police officer.

Defendant also presented an excerpt from the evidence deposition of Phillip Munts, another employee of Phillip's Towing. Munts testified that he spoke with Blumenthal when Blumenthal came to pick up his car. When asked whether Blumenthal agreed to compensate him for any time he missed from work to assist Blumenthal in the case, Munts responded that he did not. However, Munts was then impeached with testimony he had given at a prior deposition in which he was asked the following question regarding Blumenthal: "Did he agree to compensate you for the time you lost from work?" Munts' response was: "Yes, he did." Munts acknowledged that he was asked that question and gave that answer. Munts also testified that he saw the light change from green to yellow and plaintiff was just exiting the overpass. He said it appeared that plaintiff sped up to get through the intersection. He also stated that he heard the crash.

Dr. Scott Cordes, an orthopedic surgeon, testified that he treated plaintiff upon her arrival at the hospital. He testified that plaintiff's X rays showed she had a shattered kneecap, a fracture to three areas of her right ankle, a fracture to her heel bone, and a fracture to her wrist joint. Dr. Cordes' diagnosis was comminuted right patellar fracture, trimalleolar fracture of the right ankle and the right calcaneus fracture, left scaphoid fracture. He testified that plaintiff also had some internal injuries, which included a liver laceration and a laceration hematoma of the right kidney. Dr. Cordes testified that plaintiff was taken to surgery on November 23, 1992. During surgery her kneecap was reconstructed using wire and the soft tissue surrounding her kneecap was repaired. Internal fixation was performed on her ankle, which involved repositioning the ankle and securing it with wire and screws. The three fractures in her fibula were repaired using a buttress plate secured with screws. A long cast was applied. Plaintiff was given physical therapy while in the hospital and was discharged on November 30, 1992. Dr. Cordes last saw plaintiff on December 8, 1992.

On cross-examination, Dr. Cordes stated that he had an independent recollection of plaintiff because her threshold of pain was extremely low. Dr. Cordes stated that plaintiff was difficult to manage post-operatively because they could not explain the reason for her manifestations of such severe pain.

Dr. Robert Morris, a physician, treated plaintiff at Loyola University Medical Center from December 4, 1992, through December 6, 1992. Dr. Morris testified that plaintiff was diagnosed with gastritis, which developed as a result of the stress of her convalescence from the occurrence.

Dr. Edward Abraham, an orthopedic surgeon, first saw plaintiff in his office on January 23, 1993. He removed plaintiff's long leg cast, which extended from her hip joint to her toes. Dr. Abraham's testimony confirmed the injuries as described by Dr. Cordes. Dr. Abraham prescribed rehabilitation and physical therapy. In April 1993, Dr. Abraham performed surgery on plaintiff and removed the wires from plaintiff's kneecap. Dr. Abraham released plaintiff to return to work in June 1993. Dr. Abraham testified that when he saw plaintiff in September 1993, she did not have full range of normal motion of either the ankle or the knee and she was not 100%. Dr. Abraham did not believe plaintiff's complaints of pain were inconsistent with her injuries. Dr. Abraham testified that when he saw plaintiff in November 1993, she complained of some pain in the back of her knee and stiffness in the ankle. She also had a slight limp. Dr. Abraham testified that when he saw plaintiff in March 1994, she complained of pain in the front of her knee and sensitivity on the scar on her knee. Dr. Abraham stated that plaintiff was developing a neuroma and having trouble kneeling. He also testified there was swelling around the ankle joint. Dr. Abraham next saw plaintiff in February 1995 and found that she had developed a neuroma on the scar on her knee. She was having trouble kneeling and soreness of the ankle with prolonged walking. On March 24, 1995, Dr. Abraham operated on plaintiff and removed the neuroma. He also removed the plate and five screws from the fibula bone and the hardware from the ankle.

Dr. Abraham examined plaintiff just prior to his testimony. He testified that plaintiff had crepitation on the kneecap, she walked normally, her knee had normal range of motion and was stable, her scar was healed and showed no signs of neuroma, and her ankle motion was 10 degrees short of normal. Dr. Abraham testified that plaintiff's scars are permanent, she will never regain full ankle motion, she has a limp in the morning and she has a 25% chance of getting arthritis. Dr. Abraham further testified that plaintiff will not be able to do things such as running and that strenuous activity might cause problems.

Plaintiff testified as to how her injuries have affected her daily life. Plaintiff testified that since the accident there are a lot of things that she does with difficulty and some things that she cannot do. She stated that she cannot carry a basket of clothes downstairs to the

washer and dryer and she cannot clean without assistance. Plaintiff also testified that she no longer has the strength to cook from scratch. Plaintiff testified that she can no longer bathe her daughter because she cannot kneel. Plaintiff stated that she can no longer run or play soccer with her children. She also stated that she can no longer go out dancing and cannot dance the tango as she used to do at family gatherings. She stated that she cannot wear heels. She can no longer play tennis or volleyball, or go window shopping or garage sale shopping with her mother. Plaintiff also testified that she is self-conscious about one leg being shorter than the other. She stated that since November 19, 1992, there has not been a day that she has been pain free.

Frederico Perez, plaintiff's 13-year-old son, testified that prior to the accident, he and plaintiff would play soccer, climb trees, wrestle, bike ride and play tag and other games. Perez stated that prior to the accident plaintiff took care of the household chores. Perez testified that plaintiff no longer attends his soccer games because there are no stands to sit in and she cannot stand for very long. Perez also testified that he and plaintiff cannot bike ride for as long as they used to.

Ron Yelanowsky, plaintiff's boyfriend, testified that prior to the accident he and plaintiff would take the kids to the park or go bike riding on weekends and after work. He testified that he and plaintiff would also go dancing. He testified that plaintiff was responsible for all the household chores such as cooking, cleaning and grocery shopping. He testified that since the accident plaintiff is unable to play sports with the kids that involve running and is unable to go dancing. He also testified that she is unable to carry things up and down the stairs.

ANALYSIS

We find that plaintiff is entitled to a new trial based upon two errors. First, we find that plaintiff presented sufficient evidence to establish the element of "loss of normal life" and, as such, the jury's award of $0 disregarded this evidence. Second, we find that the trial court abused its discretion in refusing to allow impeachment of a critical witness with a four-year-old misdemeanor theft conviction.

I

Plaintiff's first contention is that the jury's award of $0 for the element of loss of normal life ignores proven evidence, is inconsistent with its award for other elements of damages, and disregards objective evidence of plaintiff's temporary and permanent change in lifestyle as a result of her injuries.

■ The assessment of damages is a question of fact and is within

the province of the jury. A jury's award of damages in a particular case is entitled to "substantial deference." *Snover v. McGraw*, 172 Ill. 2d 438 (1996). Nevertheless, we also recognize that "a reviewing court may order a new trial if the damages are manifestly inadequate or if it is clear that the proved elements of damages have been ignored or if the amount awarded bears no reasonable relationship to the loss suffered by the plaintiff." *Hollis v. R. Latoria Construction, Inc.*, 108 Ill. 2d 401, 407 (1985).

▪ The damages instruction on the element of "loss of normal life" offered by plaintiff and tendered by the trial court was predicated on the 1994 appellate court decision in *Smith v. City of Evanston*, 260 Ill. App. 3d 925 (1994). In *Smith*, the first district rejected the formerly used instruction that listed "disability" and "disfigurement" as elements of damage in favor of an instruction utilizing the term "loss of normal life." *Smith*, 260 Ill. App. 3d at 938. The *Smith* court stated that "loss of normal life" is an element of damages awarded to plaintiff upon proof of plaintiff's " '[d]iminished ability to enjoy life that the plaintiff has experienced' [citation], which should include plaintiff's temporary or permanent inability to pursue the pleasurable aspects of life, such as recreation or hobbies." *Smith*, 260 Ill. App. 3d at 938. The court stated that "loss of normal life" is to be used in lieu of "disability," which has a common meaning but overlaps with other categories of damages, leading to an increased likelihood of overcompensation or undercompensation. *Smith*, 260 Ill. App. 3d at 938.

The issue of the propriety of the *Smith* instruction is not before us, nevertheless, we feel constrained to comment on it. At oral argument, defense counsel argued that under the *Smith* decision, in order for a plaintiff to recover damages for "loss of normal life," plaintiff must show diminishment of her ability to enjoy life given plaintiff's prior activities. As an example, defense counsel stated that to recover damages for "loss of normal life" based on plaintiff's inability to run as a result of an injury, plaintiff must put forth evidence that prior to the injury plaintiff not only engaged in the sport of running but also that she enjoyed it. Defense counsel asserted that plaintiff must then show that, as a result of the injury, her enjoyment level achieved from running is diminished. It follows from this argument that, if prior to an injury a plaintiff worked but did not enjoy it, she would not be entitled to damages under this element resulting from her inability to work after an injury since this does not meet the requirement of diminished enjoyment. Moreover, what is a normal life? This is an exceedingly subjective standard which makes damages especially difficult to quantify. While we certainly have a great deal of respect for our own appellate court and its decisions, we believe that when

instructing the jury on the element of damages, the trial court should follow the Illinois Supreme Court's recommended instruction, Illinois Pattern Jury Instructions, Civil, No. 30.04 (3d ed. 1995), and instruct the jury on the element of "disability" rather than substituting the element of "loss of normal life" contained in the appellate court's *Smith* decision.

Returning to the issue at hand, in addition to *Smith v. City of Evanston*, plaintiff relies on the following three cases in support of her argument that she is entitled to a new trial: *Slavin v. Saltzman*, 268 Ill. App. 3d 392 (1994), *Sands v. Glass*, 267 Ill. App. 3d 45 (1994), and *Martin v. Cain*, 219 Ill. App. 3d 110 (1991). In each of the three cases, the appellate court reversed jury awards of $0 for "disability" due to the existence of evidence of serious injury and testimony establishing a change in plaintiff's lifestyle. In those cases, the court noted that it was inconsistent for the jury to find that the plaintiff "was injured and that this injury resulted in pain, medical costs, and lost wages, but that the injury did not cause disability and disfigurement." *Slavin*, 268 Ill. App. 3d at 403. However, the second district recently decided *Zuder v. Gibson*, 288 Ill. App. 3d 329 (1997), and, after reexamining this precedent in light of the Illinois Supreme Court's decision in *Snover v. McGraw*, 172 Ill. 2d 438 (1996), it reversed itself with respect to *Slavin* and *Sands* and called the fifth district's *Martin* decision into doubt.

In *Snover v. McGraw*, 172 Ill. 2d 438 (1996), the Illinois Supreme Court held that a jury can award pain-related medical expenses while concurrently finding that the evidence of pain and suffering was insufficient to support a monetary award. *Snover*, 172 Ill. 2d at 448. In *Snover*, the supreme court affirmed a jury's verdict in favor of the plaintiff for approximately $1,500 (her total medical expenses) and $0 for pain and suffering. The court found that, based on the evidence, the jury could have concluded that plaintiff suffered minimal discomfort. *Snover*, 172 Ill. 2d at 449.

In the second district's *Zuder* case, plaintiff brought an action for injuries sustained when his vehicle was struck from behind by another vehicle driven by defendant. *Zuder*, 288 Ill. App. 3d at 330. The jury awarded plaintiff damages for medical expenses and pain and suffering, but failed to award any damages for disfigurement and loss of normal life and plaintiff appealed. *Zuder*, 288 Ill. App. 3d at 330. The second district noted that under the rule of law articulated in *Snover*, "a jury has complete discretion to award damages in the manner it sees fit, provided that the award falls within 'the confines of the evidence.'" *Zuder*, 288 Ill. App. 3d at 335, quoting *Snover*, 172 Ill. 2d at 449. The court then stated:

"An application of these principles to the instant case leads us to conclude that an award for medical expenses and pain and suffering, without a corresponding award for disability and disfigurement, does not warrant automatic reversal. Instead, our review will be limited to a consideration of whether the jury's award falls within 'the confines of the evidence' and whether the trial court abused its discretion in ruling on the post trial motion. [Citation.] Therefore, to the extent that our decisions in *Slavin* and *Sands* adopt the reversible *per se* rule, they are overruled." *Zuder*, 288 Ill. App. 3d at 335.

Accordingly, based on *Snover*, the question is whether the jury's award of $0 for loss of normal life falls within the confines of the evidence. We find it does not.

■ The evidence in the instant case demonstrates that plaintiff was in a long leg cast for over two months. Dr. Abraham testified that as a result of her injuries plaintiff will never regain full ankle motion and has a 25% chance of getting arthritis. Dr. Abraham also testified that plaintiff will not be able to run and that strenuous activities may cause her problems. Plaintiff testified that she cannot carry laundry up and down stairs and needs assistance when she cleans. She stated that she can no longer bathe her daughter due to an inability to kneel. She further stated that she can no longer run and play with her children, go dancing, or window-shop with her mother. This testimony was corroborated by plaintiff's son and plaintiff's boyfriend.

In denying plaintiff's posttrial motion on this issue, the trial court referred to Dr. Abraham's testimony and stated:

"One of the problems is that the doctor got up and testified that she could do everything. That was the problem."

The trial court further stated:

"I think the jury awarded a substantial amount of money for substantial injuries. I understand your concern about the zero on disability. I understand that. I'm glad the Supreme Court has taken the *Smith* case. I'm anxious to see what they're going to do with it. I'm going to deny your motion."

Ultimately, the supreme court denied leave to appeal on the *Smith* case. *Smith v. City of Evanston*, 157 Ill. 2d 523 (1994). Nevertheless, we find that the trial court's denial of plaintiff's posttrial motion on the issue of loss of normal life was erroneous. Plaintiff presented sufficient evidence to establish this element. The only evidence presented to contradict plaintiff's evidence was the testimony of Dr. Abraham. Contrary to the trial court's belief, Dr. Abraham did not testify that plaintiff "could do everything." Rather, Dr. Abraham testified as follows:

"I said that she was improved. I did not say that she was cured of

all her problems. She did have a mild limp when she walked. So, it was impossible for me to have her do whatever she wants in terms of sports and so, but she was able to hold a job and function. But she was not a hundred percent when I saw her."

Basically, Dr. Abraham's testimony only established that plaintiff was able to resume her job.

The trial court abused its discretion in denying plaintiff's posttrial motion on this issue. Plaintiff presented sufficient evidence to establish this element and the jury's award of $0 disregarded this evidence. Accordingly, we find that a new trial is warranted.

## II

The second contention of plaintiff that warrants reversal is that the trial court committed prejudicial error in barring plaintiff from cross-examination of Michael Williams regarding his theft conviction, inquiring into the basis for it, and challenging plaintiff to rebut Williams' version of the underlying circumstances.

In *People v. Montgomery*, 47 Ill. 2d 510 (1971), the Illinois Supreme Court adopted proposed Federal Rule of Evidence 609. Under this rule, a prior conviction is admissible for the purposes of attacking the credibility of a witness if the crime (1) was punishable by death or imprisonment in excess of one year, or (2) involved dishonesty or false statement regardless of the punishment, unless (3) in either case, the judge determines that the probative value of the evidence of the crime is substantially outweighed by the danger of unfair prejudice. *Montgomery*, 47 Ill. 2d at 516. This rule applies to civil as well as criminal cases. *Knowles v. Panopoulos*, 66 Ill. 2d 585 (1977). If a conviction meets one of the first two requirements of the rule, the judge must then "conduct a meaningful test" and determine whether the prejudicial effect of admission of the conviction substantially outweighs the probative value. *People v. Elliot*, 274 Ill. App. 3d 901, 909 (1995). The record must show that the trial court understood and used its discretion and considered factors on both sides of the scale. *Elliot*, 274 Ill. App. 3d at 911.

The probative value side of the scale should focus on the person's truthfulness as a witness. *Elliot*, 274 Ill. App. 3d at 909. "Crimes involving deceit, fraud, cheating, or stealing press heavily on the probative value side of the scale." 274 Ill. App. 3d at 909. Misdemeanor theft is a crime involving dishonesty which may be used for impeachment purposes. *People v. Spates*, 77 Ill. 2d 193, 203 (1979). The supreme court stated in *Spates* that "[w]e do not deem it prudent *** to require a court to look behind a conviction to ascertain the specific type of theft upon which the conviction was based ***. The more sensible approach is that a conviction for theft, of whatever type,

will be admissible to impeach the credibility of a witness." *Spates*, 77 Ill. 2d at 203-04.

We also note that "there is less possibility of unfair prejudice when a prior conviction is used to impeach a witness than when it is used to impeach a defendant, because a defendant who has committed a previous crime may be convicted because of his prior offense, rather than because of the lack of credibility in his defense." *People v. Thomas*, 58 Ill. App. 3d 402, 405 (1978); *People v. Jacobs*, 51 Ill. App. 3d 455, 460 (1977).

Plaintiff relies principally on the cases of *People v. Thomas*, 58 Ill. App. 3d 402 (1978), and *Minor v. City of Chicago*, 101 Ill. App. 3d 823 (1981). In *People v. Thomas*, the defendant was on trial for murder and contended he acted in self-defense. *Thomas*, 58 Ill. App. 3d at 404. The trial court barred admission of evidence of a two-year-old prior misdemeanor theft conviction of the only eyewitness. *Thomas*, 58 Ill. App. 3d at 404. On appeal, this court reversed and remanded for a new trial, stating that the error in keeping from the jury relevant facts bearing on the witness' trustworthiness prejudiced the defendant. *Thomas*, 58 Ill. App. 3d at 406.

In *Minor*, plaintiff filed a negligence action against the City of Chicago for injuries allegedly sustained as a result of a fall on a public sidewalk. *Minor*, 101 Ill. App. 3d at 823. The trial court barred admission of a certified copy of plaintiff's conviction for theft and also barred the fact that plaintiff admitted in a discovery deposition to have been sentenced to one year in jail for theft in 1973. *Minor*, 101 Ill. App. 3d at 825. On appeal, this court reversed and remanded for a new trial. The court stated that both convictions occurred within the 10-year limit and involved crimes of dishonesty. Also, the court noted that plaintiff's testimony and credibility were of the utmost importance since plaintiff was the sole occurrence witness. *Minor*, 101 Ill. App. 3d at 825.

■ As was the case in both *Thomas* and *Minor*, Michael Williams was an important witness. His testimony was critical to defendant's theory in this case. Other than Munts' evidence deposition (in which Munts was impeached), Williams' testimony was the only testimony to support a finding of plaintiff's contributory negligence. His testimony was that plaintiff was travelling at 35 to 40 miles per hour and that plaintiff ran a red light. He said he saw the light change to red but he never testified that he saw the crash. On cross-examination, he admitted that his testimony on plaintiff's speed was based upon what he heard, not upon what he saw. In fact, the only truly independent witness, Jose Vasquez, testified that Blumenthal turned left into the intersection while the light was green without activating his turn

signal. In addition, Williams testified that he was talking to Chester Morris when the accident occurred; however, Morris testified he was inside and that he did not see the accident. Williams' credibility is tenuous at best and since Williams was such a critical witness, the jury should have been allowed to consider all relevant evidence in order to completely assess the weight to be given to his testimony.

Plaintiff clearly met the requirements set out in *Montgomery* when counsel presented the court with a certified copy of Williams' four-year-old conviction for misdemeanor theft. The trial court should have then determined whether the probative value of admission of the conviction was substantially outweighed by its prejudicial effect. The record is devoid of any evidence that the trial court conducted a meaningful balancing test. Rather, the trial court examined the underlying circumstances and then asked plaintiff's counsel if counsel had any facts to dispute Williams' version. The trial judge then stated:

> "This is what we have. We have [a] certified copy of the conviction. You're offering me a certified copy of the conviction for misdemeanor and attempted theft. The conviction was in 1991, four years ago. I have discretion as to whether or not it will be admitted in this instance. I'm ruling against you, [counsel], and not present it as impeachment."

This was improper. There is no legal basis for the trial court's inquiry into the merits of the conviction. Moreover, aside from the trial court's reference to the age of the conviction, there is no indication that the trial court weighed any further factors or addressed the probative value. In addition, during the motion *in limine*, the trial judge was made aware that Williams had recently been arrested for allegedly towing legally parked cars to illegal parking spaces, taking a picture of the car and then towing it to his employer, Phillip's Towing. While we acknowledge that the arrest is inadmissible, the trial judge was nevertheless made aware that this witness was no "George Washington." Indeed, a four-year-old conviction for theft is well within the bounds of the standards set out in *Montgomery* and it is clear to this court that the probative value far outweighed any prejudicial effect.

Accordingly, we find that the trial court erred in failing to conduct a meaningful balancing test and refusing to admit the conviction and further that inquiring into the underlying circumstances and merits of the conviction constitutes abuse of discretion. Plaintiff was prejudiced by this error and a new trial is warranted.

Accordingly, as to the issues addressed in this opinion, the judgment of the circuit court of Cook County is reversed in part and the

cause is remanded for a new trial; and this cause is affirmed in part, as to the issues addressed in the Rule 23 order issued this date.

Reversed and remanded.

O'BRIEN and GALLAGHER, JJ., concur.