WILLIAM STOKES, Plaintiff-Appellee, v. THE CITY OF CHICAGO, Defendant-Appellant.

First District (3rd Division)   No. 1—01—2607

Opinion filed July 31, 2002.

Mara S. Georges, Corporation Counsel, of Chicago (Lawrence Rosenthal, Benna Ruth Solomon, and Erika Dunning, Assistant Corporation Counsel, of counsel), for appellant.

Richard S. Zachary, of Chicago, for appellee.

JUSTICE WOLFSON delivered the opinion of the court:

William Stokes sued the City of Chicago (the City) for injuries he said he sustained when his foot caught in a hole in the sidewalk at 656 North Green Street. Throughout the trial the City insisted it had the

right to impeach Stokes's credibility with his three prior burglary convictions. The trial court was equally insistent that the City had no such right.

The jury found in favor of Stokes, awarding him $30,000 in damages. The single issue in this appeal is whether the trial court committed reversible error when it refused to allow the City to impeach Stokes.

We reverse and remand.

FACTS

Because the City raises only the impeachment issue, we merely sketch the evidence presented at trial.

At the time of trial, in February of 2001, Stokes was an inmate at the Vienna Correctional Center in Vienna, Illinois. The trial court's issuance of a writ of *habeas corpus* permitted Stokes to appear at trial, where he was allowed to wear civilian clothes.

He had been convicted of burglary three times: (1) August 23, 1993; (2) April 7, 1998; and (3) July 5, 2000. In a pretrial ruling, the trial court granted Stokes's motion to bar any impeachment use of his burglary convictions. The trial court found—before, during, and after trial—that there was no issue concerning Stokes's "honesty." That is, said the court, "that's saying he's testified to something, and then there was an observer, another fact witness who testified to something else."

The trial court rejected the City's suggestion that there are other ways a party's credibility can be brought into question, concluding: "The Court finds that its prejudicial effect outweighs its probative value."

At trial, Stokes testified that on September 15, 1993, he was living at 467 West Oak Street with Martha Sallay and their five children. During the day, the children were at school, Sallay was at work, and Stokes was at home because he was laid off from his job at a fast-food restaurant.

After the children returned home from school, Stokes went to a basketball court to play with friends. Sallay met him there some time later, then they went home to eat dinner. After dinner and after putting their children to bed, just after 9 p.m., Stokes and Sallay went for their regular walk in their neighborhood. They walked at a strolling pace. Stokes was wearing low-top gym shoes.

After Stokes and Sallay had been walking for about 25 or 30 minutes they were on North Green Street. Although Stokes saw there were no streetlights in the area, he and Sallay continued to walk down the 600 block of North Green Street. The street was dark; neither the

moon nor the buildings in the area offered any illumination. Stokes said he never walked down North Green Street before that night.

Sallay held Stokes's right arm as they walked down North Green Street. As they walked, some people came near them on the same side of the street. Stokes did not see the people until they were very near to them. When the people got close to Stokes and Sallay, he jerked Sallay close to him and moved over and away from the people. He did not know the people who were coming close to them.

As the strangers passed Stokes and Sallay, Stokes's foot caught in a hole in the concrete of the sidewalk. Stokes's foot went into the hole up to the bottom of his ankle bone and his heel hit something hard. When he tried to pull his foot out, he fell over. As he fell over, he heard something crack in his foot.

After Stokes fell, he tried to stand but could not. The pain was too much. Sallay left to get help and Stokes moved himself to some steps that were about 20 to 25 feet away from where he fell. Before Sallay returned, an ambulance arrived. The ambulance took Stokes to Northwestern Hospital for treatment.

Sallay testified that during the day on September 15, 1993, she stayed home with her two youngest children and Stokes went to work. In the early evening, Stokes played basketball with some friends while Sallay cooked dinner. Sometime later, at about 7 p.m., Sallay left the house to watch Stokes play a game. After the game, Stokes talked to his friends, then he and Sallay walked home to eat dinner. After dinner, Stokes and Sallay spent some time at home putting their children to bed. Then they went for a walk.

Stokes and Sallay took their walk between 9 and 10 p.m. While they were walking, they encountered some of Stokes's friends. One of them gave Stokes a basketball. After stopping to talk to his friends, they headed back home. They walked at a normal pace to North Green Street. Stokes and Sallay were passing the basketball back and forth to each other as they walked.

Sallay was not familiar with the area of North Green Street. Although the street was dark, she and Stokes played with the basketball as they walked on the sidewalk. Stokes was either bouncing the ball or passing it to Sallay when his foot fell into a hole in the sidewalk. When Stokes's foot fell through the hole, they were between the 600 and 700 block of Green Street.

After Stokes's foot fell through the hole, he began twisting his foot, trying to get it out of the hole. In trying to get his foot out of the hole, Stokes fell over in Sallay's direction. He told her he could not get up or walk. Stokes looked to be in a lot of pain.

Stokes told Sallay to call an ambulance. So Sallay walked to

Chicago Avenue to find a phone and call an ambulance. Sallay called 911 on a pay phone and asked for an ambulance. By the time she returned to the scene, Stokes had been put in the ambulance. Sallay then walked to Northwestern Hospital to be with him.

Stokes's lawyer read into evidence the evidence deposition of Dr. Cordes. Dr. Cordes treated Stokes in the emergency room at Northwestern Hospital. He diagnosed Stokes with a calcaneus (heel bone) fracture of the left foot. Dr. Cordes's records list the cause of injury as a "trip and fall."

According to the doctor, when Stokes was admitted in the emergency room, he said he had fallen in a pothole in the street. Dr. Cordes opined that "it requires a fairly exertional amount of energy to fracture that calcaneus ***. Typically we see these from falls from [great] heights ***." Dr. Cordes said he would have to know the depth of the hole and the speed of the foot entering the hole to determine whether it could have caused Stokes's injury. Although he could not determine what caused Stokes's heel to break, he "supposed it could" have happened if the twisting of the body generated enough torque to break the bone.

Dr. William Dobozi, an expert in orthopedic trauma, testified for the City. Based on Stokes's X rays, the doctor opined Stokes suffered a depressed "complex" fracture of his calcaneus. Because the fracture was "complex," Stokes's broken heel bone must have been caused by a high energy force.

Generally, said the doctor, this type of injury occurs as a result of a fall from great heights or a high-speed auto accident. Dr. Dobozi's opinion was that the condition of the sidewalk on North Green Street did not cause Stokes's heel bone to break. He criticized Dr. Cordes's opinion to the extent that Dr. Cordes did not take into account the fact that the fracture was "complex."

Carlos Martinez, the last witness to testify at trial, was one of the paramedics who treated Stokes. In Martinez's report, he wrote Stokes told him he was "walking down the street and stepped into a pothole."

After closing arguments, the jury deliberated and then returned its verdict in favor of Stokes. The trial court entered judgment on the verdict and denied the City's motion for a new trial. This appeal followed.

DECISION

The trial court veered off course when it determined there was no "honesty" issue here because no other eyewitness contradicted Stokes's version of what happened. We assume the trial court's reference to Stokes's "honesty" was intended to address the question of

whether Stokes's credibility was an issue in the case. It is a rare trial where a party's credibility will not be an issue. This was not one of them.

The exact spot where the fall took place—street or sidewalk—was an issue. So was the way his foot entered the hole: the front of the foot or the whole foot? The way Stokes moved his foot in the hole was in dispute, as was the amount of pain he felt from the time of injury to the time of trial.

If Stokes was not looking where he was going at the time he fell, the City would not be liable. See *Siegel v. Village of Wilmette*, 324 Ill. App. 3d 903, 907-08, 756 N.E.2d 316 (2001). If he fell in a pothole while walking on the street outside a crosswalk, there would be no liability. See *Sisk v. Williamson County*, 167 Ill. 2d 343, 347, 657 N.E.2d 903 (1995).

Our review of the record discloses ample reasons to find there was a credibility issue here.

First, Stokes failed to testify consistently with his own prior testimony: (1) at trial Stokes said his whole foot was caught in the hole, but at his deposition he said it was the front part of his foot that slipped inside the hole; (2) at trial Stokes identified a photograph of the sidewalk near 656 North Green Street that showed the hole in which his foot became caught; however, when he was later shown another photograph of the sidewalk, he said he could not identify the hole because "it was dark that night" and he could not "even see what was around that hole"; and (3) at trial Stokes said he did not remember what he told the paramedics when they arrived, but at his deposition he said he told the paramedics he fell in a pothole.

Second, Stokes failed to testify consistently with Sallay: (1) at trial Stokes said he was laid off and Sallay was working, but Sallay said she stayed home and Stokes was working—Sallay changed her mind two times and finally said she did not remember—; (2) Sallay could not recognize any photograph of the sidewalk as the area where Stokes fell, though Stokes could; (3) at trial Stokes said he did not know the people who approached them on North Green Street, but Sallay said the people were Stokes's friends and one of them gave him a basketball to play with; (4) at trial Stokes said Sallay was holding him when he fell, but Sallay said she was not holding him and was walking "a little bit to the side of him"; and (5) at trial Stokes did not say, as Sallay did, he and Sallay were playing with a basketball when his foot fell in the hole—Stokes was either bouncing, passing, or reaching for the ball.

Third, Stokes failed to testify consistently with Dr. Cordes and Carlos Martinez: at trial Stokes said his foot got caught in a hole in

the sidewalk, but (1) Dr. Cordes said that when Stokes arrived in the emergency room he said he had fallen in a pothole in the street, and (2) Martinez wrote in his report that Stokes said he was walking down the street and a pothole caused him to fall.

Finally, it is significant that the City's expert, Dr. Dobozi, testified that the complex fracture incurred by Stokes was not caused by the hole in the sidewalk on North Green Street. That, alone, would be enough to create a credibility issue.

■ A finding that a witness's credibility is an issue in the case establishes the relevance of an attack on that credibility by means of a prior conviction. Then the trial court turns to the seminal Illinois decision: *People v. Montgomery*, 47 Ill. 2d 510, 268 N.E.2d 695 (1971).

■ In *Montgomery*, the supreme court adopted the then-proposed Federal Rule of Evidence 609: A prior conviction is admissible for the purpose of attacking the credibility of a witness only if the crime (1) was punishable by death or imprisonment in excess of one year, or (2) involved dishonesty or false statement regardless of the punishment, unless (3) in either case, the judge determines that the probative value of the evidence of the crime is substantially outweighed by the danger of unfair prejudice. *Montgomery*, 47 Ill. 2d at 516. Evidence of a conviction is not admissible if " 'more than 10 years has elapsed since the date of conviction or of the release of the witness from confinement, whichever is the later date.' " *Montgomery*, 47 Ill. 2d at 516, quoting 51 F.R.D. 391. (Rule 609 was enacted in a slightly different form, but Illinois decisions have adhered to the proposed version.)

■ The *Montgomery* rule applies to civil cases as well as criminal cases. *Knowles v. Panopoulos*, 66 Ill. 2d 585, 363 N.E.2d 805 (1977). It applies to misdemeanor convictions that are crimes of dishonesty. *People v. Spates*, 77 Ill. 2d 193, 203, 395 N.E.2d 563 (1979) (misdemeanor theft conviction properly used to impeach defendant charged with armed robbery).

When *Montgomery* applies, the trial judge's first task is to determine whether the prior conviction fits one of the first two alternative factors—a felony conviction or conviction of any crime involving dishonesty or false statement. At this stage, there is no need to consider the nature of the felony conviction. Any timely felony conviction will satisfy the first *Montgomery* factor. See *People v. Atkinson*, 186 Ill. 2d 450, 461, 713 N.E.2d 532 (1999) (not error to allow use of burglary conviction to impeach defendant charged with burglary); *People v. Williams*, 173 Ill. 2d 48, 670 N.E.2d 638 (1996) (not error to allow use of aggravated battery conviction to impeach defendant charged with murder). Appellate decisions that indicate the nature of the prior conviction must bear on the witness's truthfulness before it

can be considered for use as impeachment are trumped by *Williams* and *Atkinson*. See, for example, *People v. Elliot*, 274 Ill. App. 3d 901, 908-09, 654 N.E.2d 636 (1995); *Housh v. Bowers*, 271 Ill. App. 3d 1004, 1006-07, 649 N.E.2d 505 (1995).

■ When either of the first two alternative *Montgomery* factors has been satisfied, the analysis shifts to vital ground: the balancing test. Our supreme court has expressed "concern about the indiscriminate admission of all prior felony convictions for impeachment purposes absent application of the critical balancing test mandated by *Montgomery*." *People v. Williams*, 173 Ill. 2d at 82.

This last factor, the balancing test, requires the trial judge to weigh the prior conviction's probative value against its potential prejudice. Here, the nature of the conviction does matter, because it "aids the jury in assessing a witness' credibility." *Atkinson*, 186 Ill. 2d at 458. The more the prior conviction smacks of testimonial dishonesty, the more probative weight it has. *Torres v. Irving Press, Inc.*, 303 Ill. App. 3d 151, 160, 707 N.E.2d 248 (1999). Convictions involving deceit, fraud, cheating, or stealing are the kinds of crimes that " 'press heavily on the probative value side of the scale' " (*Torres*, 303 Ill. App. 3d at 160, quoting *People v. Elliot*, 274 Ill. App. 3d 901, 909 (1995)), although a conviction that had little or nothing to do with truth-telling survived supreme court scrutiny in *Williams*, 173 Ill. 2d at 83 (no error to allow use of an aggravated battery conviction to impeach a defendant charged with murder).

Trial judges are admonished not to apply the balancing test "mechanically." *People v. Williams*, 161 Ill. 2d 1, 38-39, 641 N.E.2d 296 (1994). That is, trial courts should not tip the balancing test toward probative value simply because all felonies show a disrespect for society, and, thus, indicate a willingness to lie on the witness stand. *Williams*, 161 Ill. 2d at 39. It must be a "meaningful" balancing test. *Torres*, 303 Ill. App. 3d at 162 (failing to conduct a meaningful balancing test and refusing to admit a nonparty witness's misdemeanor theft conviction for impeachment was reversible error).

A slight tipping of the scales toward the risk of unfair prejudice is not enough to exclude the prior conviction. The trial court in this case erred when it conducted a simple balancing test. To exclude the evidence, the trial court must find the risk of unfair prejudice *substantially* outweighs the probative value of the conviction for impeachment purposes. *Montgomery*, 47 Ill. 2d at 516.

■ Trial judges are given factors to use when conducting the balancing test—an exercise in discretion. These include the nature of the prior conviction, its recency and similarity to the present charge, other circumstances surrounding the prior conviction, and the length

of the witness's criminal record. *Atkinson*, 186 Ill. 2d at 456. Convictions of the same crime for which the defendant is on trial should be admitted "sparingly." *People v. Cox*, 195 Ill. 2d 378, 384, 748 N.E.2d 166 (2001). However, the supreme court found no error where the trial judge in a burglary case allowed the defendant to be impeached with two prior burglary convictions. *Atkinson*, 186 Ill. 2d at 461.

The appellate courts have had several occasions to examine a trial judge's exercise of discretion when admitting or excluding prior convictions for impeachment purposes. See *Housh*, 271 Ill. App. 3d at 1007 (abuse of discretion to allow impeachment use of plaintiff's attempted robbery conviction in personal injury trial); *Holmes v. Anguiano*, 174 Ill. App. 3d 1081, 529 N.E.2d 300 (1988) (abuse of discretion to bar impeachment use of defendant's attempted robbery conviction in personal injury trial); *Minor v. City of Chicago*, 101 Ill. App. 3d 823, 825, 428 N.E.2d 1090 (1981) (abuse of discretion to bar impeachment use of plaintiff's two misdemeanor theft convictions in personal injury trial; since plaintiff was the sole occurrence witness, his "testimony and credibility was of the utmost importance in the jury's determination").

■ In this case, the trial court erred when it found Stokes's "honesty" (credibility) was not an issue, when it failed to analyze Stokes's burglary convictions in light of the first of the two *Montgomery* alternative factors, and when it failed to conduct a correct and meaningful balancing test.

Plaintiff's credibility was a central issue in this case. Because we believe the trial court failed to correctly analyze the City's offer of three burglary convictions to impeach the plaintiff, we reverse the court's judgment and remand this cause for a new trial.

This opinion should not be read as mandating the admissibility of any of Stokes's burglary convictions for impeachment purposes. We do hold the convictions satisfy the first *Montgomery* factor. It is for the trial court to determine whether the use of one, two, or all three of the convictions would survive the balancing test. That is, whether the probative value of the jury hearing about one or more burglary convictions in order to weigh Stokes's credibility is substantially outweighed by the risk of unfair prejudice. The scales tip toward exclusion in any case when "[t]he risk of misleading or overpersuading the jury is palpable." *People v. Bedoya*, 325 Ill. App. 3d 926, 943, 758 N.E.2d 366 (2001).

We also suggest that should the trial court allow use of one or more of the burglary convictions, it should offer to contemporaneously instruct the jury on the limited purpose of the evidence. See Illinois Pattern Jury Instructions, Civil, No. 3.05 (2000). The plaintiff would

be free to reject the offer. Limiting instruction or not, the trial court must ensure that the prior conviction is kept to its limited purpose.

CONCLUSION

Because the trial court committed reversible error when it refused to consider the City's offer of Stokes's prior burglary convictions, we reverse the court's judgment and remand this cause for a new trial.

Reversed and remanded.

HALL, P.J., and CERDA, J., concur.